**McAllister Olivarius**
Jan Cervenka (SBN 344997)
Dr. Ann Olivarius (*pro hac vice* motion forthcoming)
Dr. John F.O. McAllister (*pro hac vice* motion forthcoming)
641 Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 433-3456
hcervenka@mcolaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MIHAI-CONSTANTIN PETCU,

              Plaintiff,

   vs.

HARVEST CHRISTIAN FELLOWSHIP,
GREG LAURIE, RICHARD SCHUTTE,
and PAUL HAVSGAARD,

           Defendants.

Case No.: 5:25-cv-2429

**COMPLAINT**

DEMAND FOR JURY TRIAL

1
2
3
4
5
6

Plaintiff Mihai-Constantin Petcu ("Plaintiff," "Petcu" or "Mihai"), by and through his attorneys, McAllister Olivarius, files this Complaint against Defendants Harvest Christian Fellowship ("Harvest Riverside"), Greg Laurie ("Laurie"), Richard Schutte ("Schutte"), and Paul Havsgaard ("Havsgaard") (collectively, "Defendants"), for damages and other relief. In support of these claims, Plaintiff alleges as follows:

7

## **INTRODUCTION**

8
9
10

1.    In 2000 through 2008 when Plaintiff was 14 to 23 years old, he was sexually abused by Defendant Paul Havsgaard on many occasions. Havsgaard also sexually trafficked Plaintiff into sex work.

11
12
13
14
15
16
17
18
19

2.    Havsgaard was a pastor and an employee of Defendant Harvest Riverside, based in Riverside, California, and is arguably one of the most prolific child sex abusers alive in America today, having committed thousands of individual acts of abuse. Havsgaard managed the network of orphanages/foster homes where Plaintiff resided ("Harvest Homes"). The Harvest Homes were operated, funded, and administered by Harvest Riverside, whose long-time leader and unquestioned authority is Defendant Greg Laurie. Defendant Schutte, Harvest Riverside's Missions Pastor, had operational responsibility under Laurie for supervising the Harvest Homes.

20
21

3.    Defendants conducted major, successful fundraising programs in California based on Harvest Riverside's operation of the Harvest Homes.

22
23
24

4.    In the decade between 1998 and 2008, when Defendants operated the Harvest Homes in Romania, Havsgaard savagely molested and terrorized scores of Romanian children, including Plaintiff, a child in his custody and care.

25
26
27
28

5.    When Plaintiff was a minor residing in the Harvest Homes, Havsgaard sadistically stripped and spanked him. During these punishments, Havsgaard would digitally penetrate Plaintiff's anus and would also fondle Plaintiff's penis and

1  testicles. Havsgaard would be erect during this sexual abuse and was sexually
2  abusing Plaintiff for his own sexual pleasure.

3      6.    Sometimes Havsgaard abused Plaintiff without spanking, by inserting
4  his finger in Plaintiff's anus, and rubbing, stroking, and sexually touching Plaintiff's
5  penis and testicles.

6      7.    As Plaintiff matured, Havsgaard forced Plaintiff into illicit, illegal, sex
7  work with men, threatening eviction unless Plaintiff acquiesced.

8      8.    Havsgaard coerced Plaintiff to sell himself to men who performed acts
9  of sex on him including sodomy. Havsgaard took some or all of the money
10 exchanged during these acts of sex work.

11     9.    Plaintiff was further trafficked by Havsgaard into acts of sexual
12 performance on the internet.

13     10.   At all relevant times, Harvest Riverside has been a highly successful
14 church based in Riverside, California, with weekly services attracting up to 15,000
15 people. Its charismatic founder, CEO, and chief pastor Laurie attracts national
16 attention as an evangelist, podcaster and the subject of a Hollywood movie about his
17 early days, *Jesus Revolution*, which grossed $53 million in its first year.

18     11.   Havsgaard was a senior pastor at Harvest Riverside and kept that
19 position as he embarked in 1998 on a foreign mission to Romania, then the sex
20 trafficking capital of Europe, at the direction of Harvest Riverside, Laurie, and
21 Schutte.

22     12.   Prior to the last time Plaintiff was sexually abused as a minor, Harvest
23 Riverside, Laurie, and Schutte received multiple reports in California that Havsgaard
24 was sexually abusing the children in the care of Harvest Riverside at the Harvest
25 Homes. These reports started in 1999. They came from the child residents, from
26 multiple local Romanian employees of the homes, from volunteers who travelled
27 there from California, from the wife of a Harvest pastor, and from pastors
28 themselves.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

13.     From their offices in California, Harvest Riverside, Laurie, and Schutte turned a blind eye. For years, they ordered no regular inspections or staff training, instituted no safeguarding measures or relevant policies. Harvest Riverside continued to pay Havsgaard's salary, to list him as a pastor on its website, to fund the Harvest Homes by making large payments into his personal bank account with no proper accounting of his spending, and to bring Havsgaard and some residents of the Homes to California to raise money in the United States (and to suffer Havsgaard's sexual abuse in California too).

14.     Finally, by 2004, Havsgaard's abuse had become so notorious that an American missionary from another Calvary church in California, Steve Quarles, heard about it and complained to Schutte in Riverside, ultimately prompting Schutte, the pastor in charge of all missionary work at Harvest Riverside and Laurie's trusted lieutenant, to authorize an inspection by Quarles and two other Calvary ministers.

15.     Quarles and his team performed the inspection in October 2004. They were so alarmed that they requested that Schutte come see for himself.

16.     Schutte travelled to Bucharest and met with the inspection team, who laid out conclusive evidence that Havsgaard was sexually abusing children and misappropriating money, both on a shocking scale. Quarles told Schutte, "Paul [Havsgaard] needs to be on that plane with you when you leave tomorrow. He doesn't need to be another day in Romania. He needs to be gone. He is an embarrassment to every single missionary and Christian worker. Get him out of here and into counselling."

17.     But Havsgaard was an important fundraiser for Laurie's church whose "good works" also brought credit to Laurie. As senior Harvest figures told Quarles, Havsgaard "is very important because he's the face of the ministry. He's the one who goes and talks to the churches and raises the money. And we can't have him not be part of things." Firing Havsgaard would have hurt donations and possibly unleash a scandal that would hurt Laurie's reputation.

18.   So, despite proof that Havsgaard was a devious and unrelenting pedophile, and despite knowing they had provided him a perfect laboratory of desperate and vulnerable children to exploit, Harvest Riverside, Laurie and Schutte did nothing. They did not fire, suspend, withdraw or discipline Havsgaard. They neither reported him to the authorities, as was their duty under California law, nor instituted any new policies or procedures at the Harvest Homes. They did nothing to protect the children there, who remained completely subject to Havsgaard's domination and voracious sexual abuse. Nor did they do anything to offer support to Havsgaard's victims.

19.   Laurie instead engineered a "soft landing": he let Havsgaard stay in charge, free to molest and rape, while Laurie slowly closed the money spigot, until the Romanian homes finally withered to nothing—*four years* later.

20.   During this extended period, Havsgaard continued to abuse the children of the Harvest Homes, both those who were already there and many new ones he was left free to recruit, without any new restraints imposed by Harvest Riverside, Laurie or Schutte.

21.   Laurie even authorized a gift to Havsgaard of some $200,000 in severance as he continued in his post as if nothing had happened. Romanian authorities were told nothing.

22.   In 2009, a year after Havsgaard's return from Bucharest, Laurie called him "a pastor who faithfully served the Lord for many years at Harvest Christian Fellowship, the church where I pastor," and even compared his work in Romania to that of Moses with the Israelites, because his "life demonstrates the power that just one godly person can have."[1]

---

[1] Greg Laurie, *What One Can Do,* Crosswalk (June 23, 2009), https://www.crosswalk.com/faith/spiritual-life/what-one-can-do-11604878.html.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

23.     Since his return to California in 2008, Havsgaard has continued to work at Calvary churches in California linked to Harvest Riverside, with unsupervised access to children, which Defendants could easily have stopped but did not.

24.     The cover-up has worked well for Laurie. As Havsgaard raped his way through scores of children in Harvest's care including Plaintiff and returned to a comfortable life in California, Laurie grew in national prominence and wealth, with a $5.5 million home in Newport Beach, a home in Hawaii, a $90,000 car, a top-rated podcast, and a Hollywood movie.

25.     In sharp contrast, Plaintiff and the scores of other Romanian victims of Havsgaard's abuse and Defendants' cover-up went back on the streets with no money, no plan for the future, no medical care, no therapy for the PTSD and other medical and psychological damage that Defendants caused, and certainly no gifts of severance payments such as Havsgaard enjoyed. Defendants promised them security and support, betrayed that promise with years of sexual abuse, then chucked them on the street without an iota of practical support or human sympathy.

26.     Defendants have continued to conspire to cover up these horrors for which they were all responsible, a cover-up that has succeeded for 20 years—until now.

27.     The failure of Harvest Riverside, Laurie and Schutte to investigate Havsgaard took place in California. They made money in California by using their Romanian venture to raise funds and brought children to California to raise more, where Havsgaard sexually abused them. Their failure to supervise or remove Havsgaard and warn future victims took place in California. The ongoing cover-up has been directed from California.

28.     As a result of the acts and omissions that took place in California, Plaintiff was sexually abused and sexually trafficked by Havsgaard and has suffered permanent physical and psychological injuries.

**JURISDICTION AND VENUE**

29.    This Court has jurisdiction over Plaintiff's California state law claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity between the parties, with Plaintiff residing in Romania, and each Defendant residing or situated in California.

30.    This Court further has subject matter jurisdiction over Plaintiff's California state law claims pursuant to 28 U.S.C. § 1367(a), as the claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

31.    This Court has subject-matter jurisdiction over Plaintiff's claims arising under 18 U.S.C. § 1595, the Trafficking Victims Protection Reauthorization Act, and under 18 U.S.C. §§ 2423(c) and 2255, prohibiting illicit sexual conduct in foreign places, pursuant to 28 U.S.C. §§ 1331 and 1343.

32.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that all Defendants reside in this district, and 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

**CHOICE OF LAW & STATUTE OF LIMITATIONS**

33.    Cal. Civ. P. Code § 361 permits Plaintiff's California state law claims even though Plaintiff is Romanian because Plaintiff is bringing claims which arose in California and are based on acts and omissions that occurred in California. Both the substantive and procedural law of California apply to Plaintiff's California law claims.

34.    At the time of commencing this action, Plaintiff is under 40 and entitled to bring claims arising from child sex abuse under California law. *See* Cal. Civ. P. Code § 340.11(r) (2024).

35.    Due to circumstances resulting from Defendants' sex trafficking scheme, it was previously impracticable for Plaintiff to bring a case under 18 U.S.C. §1595.

36.     Plaintiff, to the extent applicable here, has pursued his rights diligently and was impeded because of extraordinary threats and coercion that Defendants applied to Plaintiff during the period of his residency in the Harvest Homes. Plaintiff was further impeded in pursing his claims by the extraordinary mental and emotional damage that Defendants inflicted on Plaintiff, and the disappearance of Havsgaard and Harvest back to California after 2008, leaving no evident route of redress to a young and traumatized Plaintiff.

37.     Defendants conspired to and did fraudulently conceal the sexual assaults perpetrated against Plaintiff and other Romanian children.

38.     Defendants' wrongful and/or negligent acts and omissions as described below were a substantial factor in bringing about childhood sex abuse of Plaintiff which caused him injury.

39.     As a result, to the extent necessary, all applicable statutes of limitations should be equitably tolled.

## **PARTIES**

### I.    **PLAINTIFF**

*Figure 1: Mihai-Constantin Petcu, circa 2002*



COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

40.    Plaintiff Mihai-Constantin Petcu is a citizen of Romania and a former resident of Harvest Homes.

41.    Mihai was born in 1985 in Bucharest. Since his father was an alcoholic and mostly absent, Mihai was raised by his mother. She suffered from diabetes and struggled to look after Mihai and his younger brother, with whom Mihai no longer has a relationship.

42.    Mihai ran away from home with his brother on several occasions. From a young age up until he was 14 years old, he alternated between living at home and on the streets in Bucharest.

43.    In 2000, Mihai met Havsgaard while he was homeless in Bucharest. Havsgaard visited Mihai and his brother several times, with Leo L.[2] by his side. Havsgaard bought a McDonald's meal for Mihai and his brother. He asked if Mihai wanted to live in one of the Harvest Homes and told him that he would be fed, clothed, and able to go to school. Mihai agreed.

44.    Havsgaard regularly physically and sexually abused Mihai, who was a child under the custody, care and supervision of Defendants until he turned 18 in 2004, and Mihai remained at the Harvest Homes until they closed in 2008. It was reasonably foreseeable to Defendants that Havsgaard would sexually abuse Mihai, as they knew or should have known about Havsgaard's rampant sexual abuse of scores of other children in the Harvest Homes.

II.    **DEFENDANTS**

**A.    Greg Laurie**

45.    Laurie was born in 1952. He currently resides in Newport Beach, California in a home worth an estimated $5,144,100 as of June 2025.

46.    At all material times herein, Laurie was a resident of California.

---

[2] Pseudonyms are employed in this Complaint to protect the anonymity of certain minor victims of Defendants, in the form of a first name plus an initial for the surname, such as "Abigail A." or "Peter P.".

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

47.    Laurie is the co-founder and Senior Pastor of Harvest Riverside. He has supreme authority and makes all important decisions concerning Harvest Riverside.

*Figure 2: Laurie preaching*



48.    Energetic and resourceful, Laurie has also become a successful author, podcaster and national figure. With his oratorical skills, books, podcasts, TV broadcasts, and regular crusades, Laurie is often likened to Billy Graham and sits on the Board of Directors of the Billy Graham Evangelical Association. His podcast has been among the top 100 most popular in the United States.

49.    Laurie's crusades typically attract hundreds of thousands of people to the biggest stadiums in the Los Angeles area.

50.    Laurie's wood-paneled office is full of pictures of him in the company of important politicians, religious leaders and actors.

51.    In February 2023, the production company Lionsgate released a movie based on Laurie's autobiography called *Jesus Revolution,* which grossed over $53 million worldwide in its first year, with revenues continuing to grow.

*Figure 3: Laurie crusade Dodger stadium, 2012*



*Figure 4: Laurie at the Hollywood premiere of* Jesus Revolution, *with wife Cathe and actors Joel Courtney and Anna Grace Barlow who played them in the film*



- 11 -

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

**B.    Richard Schutte**

52.    Pastor Richard Schutte was Missions Pastor at Harvest Riverside between 1996 and 2013. He is currently an Assistant Pastor at Impact Bible Fellowship in Riverside, California. During the events described in this Complaint, he was a principal deputy to Laurie in charge of supervising Harvest's mission to Romania, and served on the board of ARK International (USA) Inc. ("ARK"), a California charity Havsgaard and Laurie set up to raise money for Romania and other foreign projects.

53.    Schutte is and was, at all material times herein, a resident of California.

**C.    Harvest Christian Fellowship**

54.    Harvest Christian Fellowship is a nonprofit religious corporation located in Riverside, California. It is duly organized and existing under the laws of California. It was founded in 1976 by Laurie, Havsgaard and three other men as Calvary Chapel of Riverside and reconstituted in 1982 as Harvest Christian Fellowship.

55.    The origins of Harvest Riverside lie in the surfing counterculture of Southern California in the 1960s and 70s. Laurie, a charismatic, motorcycle-riding surfer himself who used marijuana and LSD, described himself in a memoir as "a long-haired liberal hippie—pro-drugs, pro-sex and pro-rock 'n' roll…"

56.    At age 17, Laurie heard the charismatic "hippie preacher" Lonnie Frisbee speak at his high school with "such authenticity and power" that he gave his life to Christ. Frisbee was a dynamic force in the "Jesus Movement" that gathered young people into evangelical Christianity in the Los Angeles area and spurred explosive growth in a Calvary church in Newport Beach, Laurie's hometown, from a handful of members to thousands within a few months.

57.    Laurie dropped out of high school and did not attend college or seminary, but was swept into the Jesus Movement through Frisbee's example. He spent considerable time with Frisbee, eating regularly at his house in a commune of

believers and, according to Frisbee's widow, even began to dress and act like him. Frisbee built up a Monday Night Bible Study group to approximately 300 members before Chuck Smith, the founder of Calvary, encouraged Laurie to take it over, which he did around 1971.

58.    Frisbee, himself a victim of child sex abuse, was later excommunicated from the Calvary movement because he was gay, and the story of Harvest Riverside's origins told in *Jesus Revolution* minimizes Frisbee's involvement and arguably amplifies the credit given to Laurie for Harvest Riverside's early success. Frisbee's widow Connie says, "I can testify that Greg Laurie is not a truth teller. He has built his ministry on Lonnie's foundation while erasing Lonnie from the story." The producers of *Jesus Revolution* did not speak to her, she says, after Laurie told them she was dead. Nevertheless, Laurie successfully developed the Bible study group in Newport Beach. He and his wife Cathe (they started dating when she was 15 and he was 18, and married after she graduated from high school) proved a reliable anchor for attracting followers.

59.    Harvest Riverside is now one of the largest churches in the United States, supporting a congregation of approximately 15,000 each Sunday that continues to grow. Harvest Riverside's mission is "to know God and make Him known." It has an active program in Hawaii where Laurie and other ministers maintain luxury homes.

60.    Since 1990, Harvest Riverside has organized regular Harvest Crusades, which have reached millions of people. It is a member of Calvary Chapel, a non-denominational association of evangelical churches, numbering 1,800 in the United States and additional locations abroad.

61.    In 2017, Harvest Riverside joined the Southern Baptist Convention. This was considered a coup for the Southern Baptists because of Laurie's prominence in the evangelical movement.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

1

### D.    Paul Havsgaard

2  62.    Paul Havsgaard was born in 1949 and now lives in Forest Hills,

3  California. At all material times herein, he was a resident of California.

4  63.    He is the oldest of seven children. Their father was an alcoholic who

5  was chronically out of work and frequently beat the children, and their mother was

6  a nurse who was often absent because she had to support her struggling family.

7  64.    Havsgaard grew up in Riverside, California and attended Ramona High

8  School, graduating in 1967, and married his high school girlfriend Kathy Warrick

9  ("Kathy") when she was 16. He then joined the Navy, serving on a destroyer off the

10  coast of Vietnam as an aviation electrician's mate. He took some college classes but

11  does not have a degree, and did not attend seminary. He and Kathy divorced in 2007

12  and have both remarried.

13  65.    When Havsgaard's marriage to Kathy was in difficulty in 1971, he was

14  advised to attend Laurie's Bible study class. Kathy wanted to end the marriage

15  because she felt no intimacy from Paul and his only sexual interest was in infrequent

16  anal sex. Laurie told her that it was her duty as a Christian wife to make the marriage

17  work, and she ultimately adopted this approach. She was later to say that according

18  to the beliefs prevailing at Harvest, a wife who criticized or contradicted her husband

19  was "lower than a sewer." The Havsgaards moved to be closer to Laurie and the

20  Calvary community, becoming active in outreach and organizational work.

21  66.    Laurie selected Havsgaard to run Harvest Homes in Romania in part

22  because they had worked closely together for decades running Harvest Riverside.

23  67.    Havsgaard became Assistant Pastor in charge of Children's Ministry

24  at Harvest Riverside in 1976. In the early 1980s, he left Harvest to become senior

25  pastor at the Calvary Chapel of the High Desert in Victorville, California. He liked

26  running a church of his own, but as Harvest Riverside grew and Laurie began to

27  travel more, Laurie thought Havsgaard would make a suitable senior deputy and

28

asked him to return. Havsgaard accepted because it gave him a chance to operate in a growing organization with larger reach than his isolated congregation.

68.    When Havsgaard returned to Harvest Riverside in 1984, many people viewed him as the second most powerful pastor next to Laurie and a possible competitor for the top job. It was a new, entrepreneurial organization, growing rapidly. Neither Laurie nor Havsgaard had a college degree or had worked outside the Calvary movement, which did not have established traditions or specific credentials required for leadership. That meant personal followings were an important barometer for pastors, and Havsgaard was popular with many at Harvest Riverside.

*Figure 5: Havsgaard baptizing a young man as pastor of*
*Calvary Chapel of the High Desert, 1982*



**◆ Baptismal**

Paul Havsgaard, pastor of the Calvary Chapel of the High Desert, dips a young man into the water at Lake Silverwood on Saturday to symbolize the man's admission into Christianity. More than 30 church members were baptized by Havsgaard at the mass baptism.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

69.    But Havsgaard also had his problems and detractors. He was known to be volatile, to have a big ego requiring constant praise, and to be badly organized, for example frequently forgetting scheduled meetings.

## GENERAL ALLEGATIONS

I.    **HARVEST RIVERSIDE ESTABLISHES CHILDREN'S HOMES IN ROMANIA**

A.    **Origins of the Harvest Homes**

70.    As reported in *Calvary Chapel Magazine*, Havsgaard "first came to Romania on an outreach in 1998 as an assistant to Greg Laurie, who is a nationally known Calvary Chapel evangelist and pastor."[3] Visiting under the auspices of a group called Samaritan's Purse, Havsgaard distributed shoeboxes of gifts to children in Bucharest on behalf of Harvest Riverside.

71.    The experience induced Havsgaard to suggest, and Laurie to approve, a permanent Harvest mission in Romania.

72.    Romania was well known in the 1990s for attracting pedophiles, because in addition to the grinding poverty that drove many people, including children, into sex work, the country's institutions were weak and corrupt, and foreigners could easily evade punishment. In fact, Bucharest was widely regarded as the pedophilia capital of Europe.

73.    Later in 1998, Havsgaard returned to Bucharest with Kathy to implement a plan Laurie had approved to build up Harvest Riverside's presence in Romania ("Harvest Homes") and established a local Romanian entity, the *Fundatia Harvest Romanian* ("Local Foundation"), to handle the formalities.

74.    While Defendants delegated much of the day-to-day running of the Harvest Homes to Havsgaard in Romania, key decisions were made in California by Laurie and Schutte in keeping with Laurie's position of supreme authority at Harvest

---

[3] Tom Price, *Saving One Child at a Time,* Calvary Chapel Magazine, 2002, at 7.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

1    Riverside, and because an important object of the Romanian venture was to bring
2    financial benefits and prestige to Harvest Riverside and Laurie.

3    **B.    The Harvest Homes Were a Fundraising Vehicle for Laurie and**
4    **Harvest Riverside**

5    75.    The Harvest Homes were designed in part as a fundraising and
6    marketing tool for Harvest Riverside, which was able to attract more money and
7    positive regard for itself and Laurie in the United States by highlighting its charitable
8    efforts in Romania.

9    76.    Defendants conducted regular and substantial fundraising programs in
10   California based on the Romanian venture.

11   77.    Defendants established a California charity, ARK, to raise money in the
12   United States for the Harvest Homes and other international projects and to promote
13   the Harvest organizations. Harvest and ARK, in partnership, conducted many
14   fundraising events in California. The money raised in these joint fundraisers went
15   through the California corporation and was then redistributed to Harvest Riverside
16   and other Harvest Riverside ventures.

17   78.    Harvest Riverside and ARK shared employees and management,
18   including Havsgaard (employee of Harvest Riverside, on the board of ARK) and
19   Schutte (employee and senior pastor at Harvest Riverside, on the board of ARK).
20   Another ARK board member, Wes Denham ("Denham"), was a Calvary minister
21   close to Laurie and Schutte.

22   79.    Defendants set up ARK in California to be a fundraising vehicle for
23   their activities in Romania and became a conduit for members of Harvest Riverside
24   to donate funds meant for Harvest Riverside's activities in Romania, in addition to
25   funds sent directly by Harvest Riverside.

26   80.    Harvest Riverside and Laurie effectively controlled ARK.

27   81.    Money from Harvest Riverside and ARK paid employees of the Local
28   Foundation.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

82.    ARK used Harvest Riverside's and Laurie's resources and contacts to raise money, including using Harvest Riverside's main fundraising telephone number in California.

83.    Havsgaard returned frequently to California, where he remained a resident at all relevant times, checking in with Schutte and Laurie, and sometimes bringing children with him as walking advertisements for his Romanian mission (and to sexually abuse in private at his house and elsewhere). They participated in multiple church services and raised money for Harvest Riverside and the Harvest Homes.

84.    For years, Harvest Riverside deposited large sums of money supposedly designated for Harvest Homes' operating costs directly into Havsgaard's personal bank account. Havsgaard then used large portions of these funds to buy things for himself as well as abundant presents and alcohol for his child sex victims to keep them pliant, and to buy silence from Harvest staff about his child abuse.

85.    Harvest Riverside allowed this misdirection of their funds to continue for years. Laurie set up a substantial venture in Romania and directed large sums to its support, but required no proper accounts or financial audits, no regular inspections of the Homes, no child protection policies or training. Instead, Laurie continued to gather the donations that flowed into Harvest Riverside based on energetic advertising in the United States about the supposed good works Harvest was doing in Bucharest, and the accompanying prestige.

C.    **Havsgaard Arrives in Romania with a History of Sexual Criminality and Cruelty**

1.    _Havsgaard's Sister Makes an Early Report of His Abuse of Children_

86.    Havsgaard is the oldest of seven children, four boys and three girls.

COMPLAINT | _Petcu v. Harvest Christian Fellowship, et al._

87.     When Havsgaard was 12 to 18 years old, he repeatedly raped his younger sister Mary M. (who was eight to 14 years old at the time), threatening beatings and death if she reported him.

88.     In this same period, Havsgaard similarly and regularly raped another younger sister, Hanna H., also starting when she was eight, also employing similar threats.

89.     When confronted by Hanna H. and another sister, Samantha S., about this sexual abuse in or around 1994, in the presence of Havsgaard's wife Kathy, Havsgaard reluctantly admitted it but told Samantha S. "I don't need this drama; don't bother me with this."

90.     At a later point, Samantha S. concluded she had to make sure Harvest Riverside knew that her brother was a danger to children. She already found it strange that Havsgaard's big ego, bullying and volatile temper had not already set back his career. Given what she knew about his voracious sexual interest in children, she thought it likely he had been abusing them as a minister too, and worried it was all being covered up to protect Laurie and Harvest Riverside.

91.     Samantha S. decided to put Havsgaard's pedophilia on the record with the organization. She met with a Harvest Riverside lay leader, Nehemias Quintanilla, who was teaching a Spanish Bible study course. The meeting took place at a coffee shop in the Redlands area.

92.     Samantha S. reported to Quintanilla that when Havsgaard was a teenager, he had repeatedly raped his sisters Hanna H. and Mary M. as children.

93.     Quintanilla replied, "This happens in a family if they learn it from another generation. That's just what happens." But Quintanilla also told Samantha S. that a letter critical of Havsgaard had been circulated among the Harvest Riverside congregation, implying that he respected her decision to report him, and ended the conversation there.

94.    Upon information and belief, shortly after Samantha S.'s report to Quintanilla about Havsgaard's history of sexual abuse, Quintanilla told his superiors at Harvest Riverside about her allegations. On information and belief, they took no action in response.

2.    *Havsgaard Molests His Foster Daughter*

95.    While a pastor at Harvest Riverside, Havsgaard also molested a foster daughter, Julia J., starting in or around 1986, when he was in his late thirties, and she was 15 or 16.

96.    Julia J. reports: "One day I was at the dryer, and Paul came up behind me and pushed himself onto me. His penis was erect. He knew my history and that being molested was what put me in foster care to begin with. I froze. He backed away and left the garage."

97.    Shortly thereafter, when Julia J. was in her bedroom, Havsgaard "came in, crouched down, slipped his hand in my underpants, and inserted his finger into my anus. Before he put his finger in my underpants, he put it in his mouth as though he had done it many times before. Every time he did it, it was the same thing. I lived there for over a year and a half. It happened five or six times during that period."

3.    *Kathy Havsgaard Arrives in Bucharest Aware of Havsgaard's Unsuitability for the Role*

98.    Kathy's own marriage to Havsgaard was long troubled, in part because of his sexual compulsions. He did not want to have sex with her, and when they did, perhaps two or three times a year, he only wanted anal sex, which she disliked, and also to urinate inside her vagina. Havsgaard had also told Kathy that during his time in the Navy, he had strong sexual feelings for a man, whose name he would shout out during their sporadic sexual interactions. (She believed he had had sex with the man, but Havsgaard denied this.) She had reason to believe he had raped a four-year-old girl and urinated inside her. He was also emotionally distant and dominant.

99.     Despite her unhappiness, Kathy felt a strong duty, one that had been reinforced repeatedly at Harvest Riverside and by Laurie, to stand by her husband as a good Christian wife. She did not at all want to accompany Havsgaard to Romania: she was still grieving the loss of her teenage daughter, caring for her and Havsgaard's elderly parents, and wanted to be close to her children and grandchildren. But Havsgaard wanted to go, and Laurie said it was her obligation to go with her husband.

100.     The fact that Harvest Riverside was able to send an apparently wholesome married couple to Romania was an important reassurance to Romanian authorities that the Harvest Homes would be properly run, and a plus for fundraising in California. Kathy joined Havsgaard on the Board of the Local Foundation.

### D.     Daily Operations of the Harvest Homes

101.     Havsgaard never learned Romanian. Accompanied by a translator, he recruited children off the streets, most commonly by buying them McDonald's meals and promising a better life. Once he recruited a few children who spoke English, he used them (instead of an adult translator) to recruit more children. The youngest resident he recruited was four years old.

102.     Funds raised by Defendants in California paid for everything to keep the Romanian operation afloat: the purchase of the Harvest Homes themselves, their furniture and equipment, salaries for Havsgaard and local staff, food and supplies, cars, and Harvest-branded shirts and hats for employees and children.

103.     Laurie, Schutte and Harvest Riverside sent Havsgaard approximately $17,000 a month, which in Romania at that time had huge purchasing power.

104.     By comparison: Steve Quarles, an American minister working in Romania at the same time, was able to provide for his family of eight, run three different churches, and pay an assistant, all for $1,400 per month.

105.     Defendants sent the funds from California directly into Havsgaard's personal bank account. From there he transferred funds for the Harvest Homes'

1   operation into the Local Foundation's Romanian bank account based on requests

2   from the local Finance Director, Eugen Roman ("Roman"). Roman did not have

3   visibility into what Havsgaard did with the rest of the money.

4      106.   The Winter 2002 edition of the *Calvary Chapel Magazine* had an eight-

5   page article, "Saving One Child At A Time – Harvest Romania" that displayed many

6   gripping photos of Romanian street children, illustrating the moving story of Harvest

7   Riverside's decision to establish a network of children's homes in Romania under

8   Havsgaard. The article quoted Havsgaard as being "concerned about pedophiles that

9   travel throughout Europe to engage abandoned children in their perverted practices.

10  They find Romania's street children easy prey."[4]

11          *Figure 6.a: Page from Calvary Chapel Magazine, Winter 2002,*
12      *showing Havsgaard, in red shirt, talking to street children in Bucharest*

13




---

[4] Price, *supra*, at 7.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

*Figure 6.b: Zoomed-in extract from Figure 6.a,
showing the US phone number for Harvest Homes in Romania*

**Harvest Romania**
Phone 011-40-92-794-766
US Phone **(909) 687-6902**
e-mail: harvestromania@aol.com

*Figure 6.c: Zoomed-in extract from Figure 6.a,
discussing Havsgaard's work in Romania*

"Having your own children, and knowing how much you love them, makes it extremely difficult when you see the conditions of the Romanian children in the orphanages," said Bob. He has been to Russia twice on mission outreaches. This was his second trip to Romania. He was able to observe the work of ROCK ministries in the hospital in Bucharest.

"I was grieved by the hopeless situations of the babies where medical solutions are possible but finances prevent intervention." Bob was burdened when he spent time with Alexandra, a seven-month-old girl, suffering from brain damage. The doctors had given up on her recovery.

They also spent time with Paul Havsgaard, who works with street children. "Seeing children as young as eight-years-old begging on the streets, sniffing paint to get high, and being sold into prostitution by older children really breaks your heart," said Bob. "Then you see a man like

Paul Havsgaard, giving his life to these lost children. You can see the love in his eyes. They are drawn to him like you might imagine children being drawn to Jesus."

The senior pastor of CC Modesto, Damian Kyle, had heard about the work in Romania from Bill Welsh. The Modesto team met

*We are troubled on every side, yet not distressed; we are perplexed, but not in despair; persecuted, but not forsaken; cast down, but not destroyed.*
*2 Corinthians 4:8-9*

107.   Page 15 of the Winter 2002 edition of the *Calvary Chapel Magazine* asks for donations to help Havsgaard's work and lists the same phone number that Harvest Riverside used for its day-to-day business in California, (909) 687-6902. This number was also listed on Harvest Riverside's website at the time.

- 23 -

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

108.   Fundraising materials in the United States for the Harvest Homes also listed Harvest Riverside's California phone numbers as the method of contact.

109.   Defendants sought publicity in other outlets in this period, including the *Christian Science Monitor,* which refers to Havsgaard as "director of the Romanian branch of the California-based Harvest Foundation."[5]

110.   After several months at rented premises in Iancului, Havsgaard received funds and authority from Laurie and Harvest Riverside to buy a property in Buftea, a suburb about 25 kilometers northeast of central Bucharest.  The children moved there just before Christmas 1998.

111.   Owning the Buftea property allowed Havsgaard to increase recruitment.

*Figure 7: The Buftea home in 2017*



112.   By 2000, Laurie authorized the purchase of two more homes to house the growing number of children in Havsgaard's care, one in the Dămăroaia district

---

[5]Andrea Snyder, *For Romania's dropouts, a fresh start,* The Christian Science Monitor (July 3, 2003, 12:07 PM), https://www.csmonitor.com/2003/0703/p08s01-woeu.html.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

in north Bucharest for housing girls and young boys, and a smaller one in Strada Bârlogeni, mostly for boys.

113.    Havsgaard quickly made such a name for himself that police officers would bring him children they found in the streets to put in the homes.

114.    While the children in Havsgaard's care lived across multiple properties, they met frequently and came together for Bible study, prayer and Sunday school, all of which Havsgaard led in English, a language most of the children did not understand.

*Figure 8: Bible study at Harvest, which Havsgaard typically led*



115.    At first, the children were pleased to be admitted to the Harvest Homes. All had come from desperate situations, many sleeping on the street and subsisting by begging. The security of a bed, three meals a day, and the semblance of a normal family life were miracles to them.

116.    Once they had settled in, Havsgaard began to sexually abuse them.

## II.   HAVSGAARD'S SEXUAL ABUSE OF PLAINTIFF AND OTHER CHILDREN WAS RAMPANT

### A.   Havsgaard Used Defendants' Authority and Resources to Groom Scores of Children for Sex

117.   Once Havsgaard successfully recruited a child, plucked from destitution and completely reliant on his goodwill to avoid returning to the streets, he started grooming them for sex. He would begin by treating them warmly and gently, showing kindness that was unusual for these children to experience from an adult, particularly a father figure.

118.   Soon he might nuzzle the child, then progress to glancing touches, then lingering ones, on the lower back, then the thighs, buttocks, and groin. Then things got worse.

119.   At the time Havsgaard was a heavy, powerful man, 5'9", 275-300 pounds, clearly able to physically overpower children and teenagers.

#### 1.   *Havsgaard's Multiple Forms of Child Sexual Abuse*

120.   Often, under the guise of punishment for infractions both real and invented, Havsgaard stripped off the children's trousers and underwear, bent them over his legs, and hit them. Then, with them naked from the waist down, he would force them over his knee, directly on top of his crotch, and spank them.

121.   He often got erect, which the children could feel through his clothes.

122.   At times, Havsgaard would also massage their legs and buttocks, at first rubbing in a way that was not painful, but eventually he would usually probe their anal area with his fingers.

123.   This frequently led to Havsgaard painfully inserting his finger in the child's anus.

124.   Sometimes he would smell or lick his fingers after doing this, even if covered with feces, a signature fetish.

125.   The combination of spanking with digital anal penetration was so common that the children developed a polyglot Romanian-English term for it, which sounded like "spanky."

126.   For boys, he also fondled their penis and scrotum.

127.   Mostly Havsgaard abused the children in this way in private (in a bedroom or the attic), but he also did so in front of other children including at the Sunday church service, which Havsgaard led and where Harvest staff were present.

128.   Havsgaard administered these painful sexual abuse sessions regularly, from multiple times a week to several times a day, depending on the child and Havsgaard's whims.

129.   Many times, the cries of the victims were widely audible. This prompted Havsgaard to choke children during punishment, additionally terrifying them. One boy remembers being punished, then being asked to touch Havsgaard's erect penis, with Havsgaard choking him to make sure he stayed quiet, saying: "It will all be over soon."

130.   Harvest staff knew of Havsgaard's sexual abuse, and some used it to threaten children when they misbehaved, giving the kids a macabre choice of discipline: either kneel for hours with their bare knees on broken walnut shells, or with their face against the tile wall of a bathroom, arms raised, or "go with Paul"— to be spanked, fondled, masturbated, digitally penetrated, and sometimes anally raped.

131.   Beyond the "spankies" with or without anal digital penetration, for both boys and girls, Havsgaard had multiple ways of sexually abusing the children in his charge, who were as young as four:

        a.   He took shirtless photos of the boys saying they were for their American sponsors but actually used them for his own sexual gratification;

b.   He showed them pornography on computers and on his phone at the Harvest homes;

c.   He made the children join him in watching pornography, both straight and gay, commenting favorably, normalizing sexual activity;

d.   While walking or sitting with children, he repeatedly touched both boys' and girls' intimate areas, including their inner thighs and groins;

e.   He fondled the children's thighs and crotch on car trips while they sat in the passenger's seat as he drove;

f.   He took boys to spend nights in a hotel room alone with him, or on lengthy rides in his car late at night, during which he continued his touching, grooming and other sexual activities;

g.   He watched the children shower and bathe naked, often while masturbating himself;

h.   He masturbated in the boys' bedrooms, sometimes while groping one or more boys;

i.   He forced boys to masturbate him;

j.   He forced boys to accept masturbation from him;

k.   He forced boys to give him oral sex;

l.   He forced boys to accept oral sex from him;

m.   He forced boys to have anal sex with him;

n.   He would remove fecal matter from the children's anuses and lick his fingers; and

o.   He took and kept videos of sexual encounters with boys and girls, which was child pornography.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

132.   Havsgaard often accompanied his sexual abuse with a patter professing that he was their "father," that he loved them "as a father," and that they were all part of one loving "family"—with him in control. He told the children "I know what God wants," and "what I want, God wants."

133.   Havsgaard's perverse murmurings added to the harm and upset from Havsgaard's sexual abuse.

134.   Stories circulating about Havsgaard's abuse of the children caused outsiders to deride residents of the homes as gay, a terrible stigma in Romania at that time.

135.   Like other child sex abuse victims, many residents of the homes were in complete tumult about their sexual identity.

136.   Beyond Havsgaard's regular sexual conquest of boys, he also assaulted the girls. Havsgaard would undress them and force them on top of his lap. He would then brutally spank their bare bottoms. Whilst he was spanking some of them, he would touch himself.

137.   When he had finished his physical attacks, Havsgaard would then force some of the girls to stand naked in front of him, while he looked them up and down, hugged them, caressed them, and kissed them.

138.   Some educational programs were instituted at first, but these degenerated and the children emerged from the Harvest Homes with little or no schooling, prepared only for manual labor, a return to the streets and/or sex work. Some remain illiterate.

2.   *Havsgaard Lavishes Rewards on His Favorites, Further Corrupting the Ethos of the Homes*

139.   The children, at sea in this abusive environment, learned that giving into Havsgaard's predation brought rewards.

140.   His favorites received expensive gifts like stereos and PlayStations, branded clothing and sneakers, better food, trips outside the home, overnight trips to

1 hotels with him (where they had to stay in the same room and bed), and sometimes
2 permission to see their families (if they had one).

3      141.   Some boys were permitted to have girlfriends and have sex with them
4 in the homes starting at age 13 or 14—Havsgaard's way of reassuring the boys that
5 they were "not homosexual" despite regular anal rape from Havsgaard, and a reward
6 for being available to him and keeping silent.

7      142.   They were allowed to drive Harvest vehicles while underage and
8 without a license. On at least one occasion, a boy caused a serious accident.

9      143.   Several boys would unlock and open the bathroom door to watch
10 Havsgaard's wife Kathy showering. She asked Havsgaard to intervene to stop them,
11 but he did nothing, and they continued to besiege and ogle her in the bathroom.

12      144.   Finally, Kathy took to having a bucket in her bedroom to urinate and
13 used baby wipes to give herself a "shower."

14      145.   Havsgaard's favorite boys basked in their special status, despite their
15 inner turmoil, and often taunted and beat up the other kids without repercussions
16 from Havsgaard or other Harvest staff.

17          3.    *Children Were Terrified of Havsgaard's Abuse of Others*

18      146.   Havsgaard's flagrant abuse of children meant that everyone lived on
19 constant high alert, fearing when he might next single them out.

20      147.   The children often saw Havsgaard sexually abuse others through open
21 doors: "spankies," masturbation, oral sex, digital penetration, anal sex, and more.

22      148.   One child found shoeboxes and wastebaskets full of feces in the attic of
23 the Buftea home, where Havsgaard engaged in frequent anal sex with boys in his
24 care.

25      149.   One child who wanted permission to go out for an evening confronted
26 Havsgaard in front of the other children and adults in the Harvest home. He asked
27 Havsgaard directly, "What's the deal? Do I have to stay for you to suck my dick to
28 go out?"

150.   Havsgaard's response was to give a beating and "spankies."

4.   *Children Repeatedly Witness Havsgaard Having Sex with One of the Boys in His Care, Leo L.*

151.   The children often saw evidence that Havsgaard was sexually abusing other children—their friends. For instance, one girl noticed that one of the boys, Leo L., at times left Havsgaard's bedroom with a wet spot on the back of his shorts, which was apparently caused by leftover sexual lubricant or semen. Other times, children spotted dark stains on Leo L.'s trousers.

152.   In or around 2007, when Havsgaard broke his leg, he requested that another minor resident of the Harvest Homes, Roxana-Maria Turuianu, tend to him in various ways. On at least one occasion, Havsgaard asked Roxana to wash him and got an erection. Mihai walked past and saw Havsgaard masturbating himself while Roxana washed his feet.

153.   One of the children living at the Buftea home, Cristian Aeroaiei ("Cristian"), noticed Havsgaard going up to the attic and followed him there after a little while, curious about what was up there after he had seen Havsgaard carrying boxes upstairs. Cristian found Havsgaard with Leo L., both with their pants down. Leo L. was cleaning his buttocks.

154.   Another child, Bogdan Ionescu ("Bogdan"), witnessed Havsgaard perform oral sex on Leo L. In or around 2006, Bogdan went to the bathroom, which was located near Havsgaard's bedroom upstairs in Buftea. Havsgaard's bedroom door was left slightly ajar, and Bogdan could see Havsgaard kneeling on the floor, shirtless, while Leo L. sat in front of him on the couch sucking Havsgaard's penis.

155.   Alexandru-Cristian Busca ("Alexandru") also witnessed Havsgaard perform oral sex on Leo L. One day, Havsgaard had bought Leo L. a stereo, but Leo L. did not like how it sounded. Havsgaard purchased him another one, and he placed the first stereo in the attic of the Buftea house. Alexandru told Leo L. that he would like to have the discarded stereo. Leo L. told Alexandru that he (Leo L.) would ask

1   Havsgaard if Alexandru could have it. Havsgaard and Leo L. went to the attic
2   purportedly to look for the stereo, but they did not come back for several minutes.
3   Alexandru went to look for them, but when he opened the door, Havsgaard was
4   kneeling with Leo L. standing naked in front of him. Havsgaard had his mouth on
5   Leo L.'s penis.

6              5.    *Children Repeatedly Witness Havsgaard Having Sex with One*
7                    *of the Boys in His Care, Mark M.*

8   156.   Cristian also walked in on Havsgaard performing oral sex on another
9   boy, Mark M., in the home. Cristian had been looking for Havsgaard because he was
10  promised money to buy new jeans. Although Cristian was surprised by what he saw,
11  he did not leave; he just asked Mark M. to translate his request for cash so Havsgaard
12  would understand it.  Havsgaard then grabbed a handful of money and gave it to
13  Cristian, showing no embarrassment over the sexual crime he was in the act of
14  committing.  Havsgaard returned to the blow job as soon as Cristian started to leave
15  the room.

16  157.   Alexandru also shared a room with Mark M., who would beg Alexandru
17  not to leave the room, telling him, "don't leave, Paul is coming again to suck my
18  dick."

19             6.    *Havsgaard Installed Video Recording Equipment in the Attic*
20                   *Where He Regularly Abused Children*

21  158.   Photography has been a lifetime hobby for Havsgaard.

22  159.   Havsgaard installed videography equipment in the attic of the Buftea
23  home, some of which was positioned over a hole in the ceiling of the shower. In the
24  attic, Havsgaard kept audio recording devices, a box of video tapes including small
25  format ones, and boxes with significant amounts of Romanian money.

26  160.   This equipment is consistent with reports that Havsgaard took videos
27  of naked children.

28

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

161.   After some of his equipment and tapes were stolen, Havsgaard put all of his tapes in a leather bag carried over his chest that he never parted with.

7.    *A Life-Long Child Sex Abuser, Havsgaard Was Cruel and Perverse*

162.   Havsgaard used his total power over the children not just to gain sexual access, but to express his nasty and dominating personality.

163.   For example, Havsgaard put brothers in different homes to keep them isolated and increase his own power over them. He put children who displeased him out on the street in the winter, letting them plead in the cold and dark for re-entry.

164.   Havsgaard strangled and smothered children with pillows, letting go just before they lost consciousness, had them tied to beds and radiators, and kept them under "room arrest" for days.

165.   Havsgaard would promise children they could see their families but then never permit it, or he would grant, but then withdraw, permission, to prove he was the boss or make them more pliable.

166.   Havsgaard kicked children out of the homes without notice, without any place to go or funds to tide them over.

167.   Havsgaard took the children to use computers at the internet café owned by Cătălin Manescu ("Manescu"), who worked as a Harvest Romania driver and was later promoted by Havsgaard to Finance Director, located on Starada Mitropolit Varlaam. They also used a computer at the Buftea house with internet capability, often to watch porn with Havsgaard's encouragement and participation.

168.   Also, with Havsgaard's encouragement, some of the underage boys accessed online sex forums. The boys then procured customers, sold their naked pictures, and also met for paid sex, with Havsgaard taking a cut of the proceeds.

169.   In the evenings, Havsgaard also took boys to bathhouses where men, usually foreign tourists, would pay to wash and masturbate the boys, or for the boys to masturbate them.

170.    Havsgaard took a cut of their earnings. He picked the boys up late at night after their activities, taking them back after he received his share.

171.    The misery of Havsgaard's regime extended to his wife, Kathy. She saw less and less of him, because "he always had a boy with him." Excluded by Havsgaard from anything significant, and lacking purpose, Kathy "crocheted constantly" and taught this to some of the girls to have something useful to do. Havsgaard remained autocratic and emotionally distant, and she felt lonely and besieged in the acutely dysfunctional homes, to the point where she was constantly taking Valium to feel less awful. Things were so bad that Kathy built up a supply of Valium in case she had to commit suicide—and she was not a powerless child like Plaintiff, but an adult, an American, the wife of the man in charge, and a director of the Local Foundation.

172.    She returned to the United States and divorced Havsgaard in 2007.

## B.    Havsgaard Exploits Sponsors in California to Abuse Children

### 1.    _Havsgaard's Fundraising Trips to California_

173.    Defendants in California had an active fundraising program for the Bucharest homes.

174.    One aspect was Havsgaard's regular fundraising trips to California during which he spoke at Harvest Riverside during Laurie's services and at other churches. He went for several weeks every Christmas, and at other times too. Laurie enjoyed how the Romanian program reflected well on Harvest Riverside and him.

175.    During the Christmas trips, he usually brought children living in the Harvest Homes with him to show them off and elicit more sympathy and money from donors. They considered this a great privilege and he mainly picked his favorites, who were most inured to acceding to his sexual demands.

176.    Havsgaard required sex from them in California too, keeping the boys upstairs in his house with him and ordering the girls to stay downstairs.

177. On a trip in 2003, Romanian authorities required him to bring along a social worker employed by the Harvest Homes, Carmen Andreosi, to ensure that the children were properly treated. She spoke English and was supposed to accompany them on their activities. "In reality, once we arrived in the United States, Paul excluded me from caring for or supervising the children," she says. "He used me as a cover to justify his travel with the children."

*Figure 9: Harvest Homes children in California on the beach with hosts*



178. Havsgaard left Andreosi alone in his California house for long periods, sometimes for many days, without giving any information about where he was taking the children. International calls were blocked, internet access was infrequent and Andreosi was in practical terms marooned, with a few eggs and leftovers from the children's excursions left in the refrigerator.

179. Several times they were scheduled to go back to Romania; Havsgaard would leave Andreosi waiting for a pickup at the church, the library or even at the airport but not appear, changing his plans impulsively and without notification.

180. She observed: "In Romania, Paul frequently took the same group of teenage boys with him on private outings. He showered them with gifts—clothes,

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

sweets and other items—while the younger children were excluded," which made them upset. "The boys who went with him always returned quiet, never explaining where they had been or what had happened. This secrecy, combined with his favoritism, left me deeply uneasy. Although I did not personally witness physical abuse, I came to suspect that Paul might be a pedophile. The staff suspected something was wrong, but no one felt able to act at the time."

*Figure 10: Two Harvest Homes children in California*



### 2.    *False Promises to and About Sponsors*

181.    Another fundraising program tried to establish a direct connection between sponsors in California and individual children in Romania.

182.    The families in California sent care packages and money to their sponsored children, sometimes as much as $500 per month.

183.    Havsgaard bragged to the children that the sponsors were putting money aside as nest eggs to launch them when they graduated from the homes. In fact, none of the children received any of these funds, either while they stayed at the homes or afterwards. Havsgaard siphoned much of these earmarked funds for himself and his sexual favorites.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

184.    The sponsorship program, with its promise of a rosy future after Harvest, was another lie Havsgaard exploited to line his own pockets while enticing sex and compliance from the children.

185.    Some children spoke periodically to their sponsor families and told them they never saw any of this money. The sponsor families reported this back to Harvest Riverside, Laurie and Schutte, but Defendants kept Havsgaard in place nonetheless.

### 3.    *Exploiting Promises of Adoption*

186.    Another form of cruelty came from Havsgaard's assurances to many children that they were to be adopted by their sponsor families and live in the United States. Some children discussed this possibility with their future California families by video call, and the families were enthusiastic.

187.    In one instance, two children, Bogdan Ionescu ("Bogdan") and Cristina Popescu, were told that Harvest Riverside had prepared the documents needed for their adoption and move to America, and all that was required was Havsgaard's signature in front of some officials at the airport.

188.    At the airport, Havsgaard pulled Bogdan aside to go to the bathroom. Inside, Havsgaard went to grab the boy's penis, but Bogdan objected.

189.    Havsgaard used this as an excuse to refuse to sign the papers, and both children were forced to return to the Harvest Homes. They were crushed that Havsgaard had thwarted their near-escape.

190.    Back at the homes, Bogdan was spanked and sexually assaulted by Havsgaard as a further punishment for resisting sexual abuse at the airport.

## C.    Children in Harvest Homes Suffer Intense Trauma as a Result of Havsgaard's Abuse

191.    Being a child at Harvest Homes was the opposite of the settled, supportive home life Defendants advertised: it was a cruel and hypocritical jungle that taught the way to survive was to give sex to Havsgaard, and to lie.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

192.    But the alternative, the children knew, would be awful: living on the street, sleeping on newspapers, dirty, always hungry, fearful, vulnerable to violence and even death.

193.    Having to live with the possibility of physical and sexual abuse every day based on the changing whims of Havsgaard as the price for food and a bed was immensely stressful, indeed traumatic.

194.    If they accused a rich and powerful American pastor of sex abuse, they were sure that poor street kids like themselves would be disbelieved and kicked out.

195.    Some channeled their stress and misery into suicide attempts, including by hanging, by cutting their wrists, by drinking chlorine and many by taking pills. Havsgaard did nothing to help. Once they got better, he abused them again.

### III.    HAVSGAARD REPEATEDLY SEXUALLY ABUSES PLAINTIFF

#### A.    Abuse from Havsgaard at Harvest

196.    Soon after Mihai arrived at Harvest, Havsgaard frequently kissed him on the cheek and neck.

197.    When he hugged Mihai, Havsgaard would caress his lower back, often moving his hands down to caress Mihai buttocks.

198.    This unwelcome behavior occurred when Havsgaard visited the home where Mihai was staying, and the frequency was highest when Mihai was younger.

199.    Like the other children, Mihai was subject to Havsgaard's sexually charged "spankies."

200.    Havsgaard would force Mihai to fully undress. Havsgaard would then caress Mihai's buttocks, moving his hand close to Mihai anus before inserting his finger in his anus.

201.    Almost every time Havsgaard would visit the house that Mihai stayed in, he would assault Mihai.

202.   At the swimming pool, Havsgaard stared at the children in a way that made Mihai uncomfortable, especially because he and the other children were naked or just wearing swim trunks.

203.   Havsgaard would prey on Mihai, touching his genitals whenever Mihai would be close by, including when they went swimming.

204.   On one occasion, Havsgaard drove Mihai and his brother home to see his mother. Mihai was sitting in the passenger seat, and Havsgaard touched and caressed his upper thigh while he was driving.

205.   As Mihai became older, he received fewer items from Havsgaard, which he knew was because Havsgaard was finding him less attractive.

206.   Mihai remembers how he felt lucky that he did not speak English, since Havsgaard would have otherwise wanted to spend more time with him.

**B.    Havsgaard Recruits Plaintiff to Sex Work**

207.   Towards the end of Mihai's time at Harvest, Havsgaard said he had to work if he was going to stay at the Buftea house.

208.   Havsgaard brought him and other boys to bath houses where clients, usually older rich foreigners, paid to manually stimulate their genitalia or fellate them.

209.   Mihai and other boys would also use the internet for sex work while at the Buftea house or Manescu's internet café, with Havsgaard's knowledge and permission.

210.   Mihai met strangers on the internet and charged money for video chats, where he would undress and show the men his genitals.

**C.    Awareness of Abuse of Others at Harvest**

211.   While at Harvest, Mihai was aware that Havsgaard was sexually abusing other boys.

212.   Peter P. openly joked about how Havsgaard was a pedophile. When Havsgaard sat on the stairs, Peter P. would come up behind him and tap him on the shoulder or head with his penis.

213.   Mihai shared a room with Mark M., where he witnessed Havsgaard intimately touch Mark M. in bed while Mihai pretended to be asleep.

214.   Havsgaard would then take Mark M. upstairs to Havsgaard's bedroom, which Havsgaard did not share with Kathy. Havsgaard showered Mark M. with gifts, which confirmed to Mihai that Havsgaard valued the sexual access Mark M. gave him.

**D.    Circumstances of Leaving Harvest**

215.   Mihai lived in perpetual fear that Havsgaard would kick him back onto the streets, while also understanding that Havsgaard wanted to keep him and other children close by for easy assault.

216.   This constant tension meant Mihai found life at Harvest oppressive. At one stage, the right side of his body became paralyzed for a month, which he thinks was a reaction to the stress of living there.

217.   Mihai left Harvest when the Buftea house closed in 2008. The conditions there had deteriorated due to a lack of funds. Mihai left with no money and nowhere to go.

**IV.   HARVEST RIVERSIDE IS GIVEN REPEATED NOTICE THAT HAVSGAARD IS SEXUALLY ABUSING CHILDREN AT THE HARVEST HOMES**

**A.    Romanian Staff Quickly Recognized Havsgaard as a Pedophile**

218.   Employees of the Local Foundation, Directors of the Local Foundation, and visitors from Harvest Riverside (including employed ministers) all quickly developed suspicions that Havsgaard was a child abuser, and word of this got back to Harvest Riverside in California.

219.   Children at the Harvest homes repeatedly complained about being sexually abused, both to each other and to responsible adults, including the cook

1  "Mama Tina" Radu Florea, the night watchman Paul Crivceac ("Crivceac"), and the
2  Finance Director Eugen Roman ("Roman").

3      220.   Kathy, Havsgaard's wife and a Director of the Local Foundation, had
4  known Havsgaard was a pedophile since at least 1994, when she was present for a
5  family discussion convened by his sisters to get his apology for raping them when
6  they were little girls. In Romania, she also suspected Havsgaard's abuse but did not
7  believe she should or could act on it. She was entirely dependent on Havsgaard in
8  an unwelcoming foreign country for her entire existence—income, food, shelter, and
9  adult conversation in English (she did not speak Romanian)—and subordinated any
10  worries that arose about what he was doing to children in the Harvest Homes to her
11  duties of devotion and obedience as a wife as taught by Laurie and the doctrine at
12  Harvest, which had been her lodestar for 30 years. To oppose or publicly rebuke him
13  was actually inconceivable.

14  **B.   Peter P. Reports Havsgaard's Sexual Abuse to Harvest Homes**
15  **Staff**

16      221.   Peter P. was a homeless child when he met Havsgaard. He moved into
17  one of the Harvest Homes in or around 1998. He was an early source of reports to
18  Local Foundation officials about Havsgaard's sexual abuse. As is typical of sex
19  abuse survivors, he tried different routes to get help from responsible adults,
20  escalating over time as he kept being ignored.

21      222.   Havsgaard's abuse of Peter P. was consistent with that of other children.
22  Havsgaard regularly pulled down Peter P.'s trousers and underwear and spanked his
23  bare bottom; sometimes Havsgaard would let his hand linger, massage Peter P.'s
24  buttocks, kiss them, or put his finger in Peter P.'s anus, which was painful and
25  shocking.

26      223.   Peter P. noticed that Havsgaard had favorites, on whom he would lavish
27  gifts and special trips. Peter P. was not a favorite and complained to Havsgaard about
28  getting less than the others. To console him, Havsgaard invited Peter P. into town.

224.    After the trip, when Peter P. was sleeping on the top bunk of his room, Havsgaard came in and began to caress and massage him. Havsgaard put his hands under Peter P.'s clothes and around his buttocks. Because it was difficult to reach him on the top bunk, Havsgaard asked the boy in the bottom bunk to switch with Peter P. The boy did, giving Havsgaard greater access to Peter P.'s body. Havsgaard massaged and caressed Peter P.'s buttocks for half an hour. Peter P. understood this was the price he paid for his special outing that day.

225.    When Peter P. was 12 or 13 years old, he broke his leg. With Peter P. especially vulnerable, Havsgaard insisted on washing Peter P. with his own hands. Havsgaard would caress Peter P.'s back and chest, and then move on to his buttocks and penis. He would massage his genitals for 25 minutes or more. When Peter P. asked him to stop, Havsgaard told him that he was "like a son" to him, and to relax.

226.    Another time, Havsgaard and Peter P. were in the garden for a "father-son" talk. During the conversation, Havsgaard proceeded to perform manual sex on Peter P.

227.    On another occasion, Peter P. recalled Havsgaard having a heart-to-heart with him about how proud he was of Peter P. Once again, Havsgaard put his hands down Peter P.'s trousers and began performing manual sex on him.

228.    Havsgaard asked Peter P., "Do you mind if you get a little bit wet?" Then, standing behind Peter P., Havsgaard began to masturbate so that he could ejaculate on Peter P.'s buttocks.

229.    Havsgaard then rubbed his erect penis against Peter P.'s buttocks and attempted to rape him anally, aggressively asserting his authority by violently biting Peter P. Peter P. was terrified and managed to flee, a memory that still haunts him.

230.    Peter P. felt confused and trapped. He could not reconcile Havsgaard's abuse with the man he was supposed to trust as father figure and pastor. He knew he could not question the abuse without risking eviction and further assaults.

231.    Peter P.'s response to this dilemma was to become more defiant.

232.    Peter P. told staff members about the abuse, including the cook, Mama Tina, and Crivceac, the night caretaker. Nothing changed.

233.    Peter P. wanted to provide more definitive proof so the adults at Harvest could no longer pretend everything was normal.

234.    One night in 2002, Peter P. invited a group of boys and Crivceac into the living room and phoned Havsgaard on speakerphone without telling him.

235.    In Peter P.'s words, this is what followed:

> I asked [Havsgaard] what he would do if I came to his apartment. He said we would play. I asked him if he would give me a blow job. He said he wouldn't force and would only do it if I liked it. I said no, I didn't like it. I asked him if he liked it. Paul said he'd like to "suck me." Paul had made a full confession to the room, including the staff assembled there, without realizing it. Then Paul said he would have one of his favorites the next night anyway.

## C.    A Couple from Harvest Riverside Encounters Signs of Child Abuse by Havsgaard and Reports Back to California

236.    Another Harvest Riverside congregant, Randi Douthitt ("Douthitt"), visited the Harvest Homes in approximately 2002. She recalls that Havsgaard was always asking for money for the children, and she had raised $10,000 to help. When she arrived, she could see the children needed winter coats and suggested using the money for this purpose. Havsgaard refused. He also refused to let her give the children Bibles. Both of these refusals surprised her.

237.    She was also surprised at the dilapidated state of the Homes. The walls were dirty and there was a big pile of broken bicycles.

238.    She noticed that Havsgaard spent excessive amounts of time with Mark M., including late at night, and not with his wife. She also saw that Havsgaard showered Mark M. and another favorite, Stefan S., with gifts.

239.    Douthitt knew that Havsgaard had rented a separate apartment for Stefan S., so he could stay there at age 17 with his girlfriend, who then had a baby at age 16, which she did not think taught proper Christian values.

240.   At the same time, Havsgaard was very harsh with other children; he always had at least one child on lockdown.

241.   Douthitt had gone to Bucharest with a friend, Cheryl, who was supposed to check the books. Havsgaard gave her only very limited access to financial information.

242.   All this disturbed Douthitt sufficiently that she returned to the Harvest homes two weeks later with her husband John, a minister employed by Harvest Riverside.

243.   The Douthitts offered to paint the dirty walls and to fix the bicycles, but Havsgaard would not let them. They offered to stay in Bucharest to help him for several months, but Havsgaard refused that too. The Douthitts got the impression that Havsgaard did not want them to know what was going on in the Harvest Homes. They did not see direct evidence of pedophilia, but they suspected it.

244.   When the Douthitts returned to California, they heard from an official at Harvest Riverside who wanted to know what they had seen at the Homes. They gave a full report of what they had witnessed and their impressions of Havsgaard.

### D.   Roman Triggers Investigation by Harvest Riverside

1.   *Roman Learns of Havsgaard's Sexual Abuse of Children*

245.   As early as 2001, a woman Harvest hired as an educator told Roman, the Finance Director and board member of the Local Foundation, that there was something suspicious happening between Stefan S. and Havsgaard. She suspected that Havsgaard was a pedophile.

246.   Roman then asked Stefan S. if Havsgaard had been abusing him. Stefan S. denied this, but told the other boys that Roman had "figured it out."

247.   The news of Roman's discussion with Stefan S. reached Havsgaard, who summoned Roman to an urgent meeting with Kathy Havsgaard also present.

248.   Havsgaard tried to gaslight Roman, asking "How could you think I would harm [the children]?"

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

249.    Roman remained suspicious. He made a friend at Harvest Riverside, Dan Cojocnean ("Cojocnean"), who was originally from Romania and immigrated to California. Cojocnean was in charge of assembling contributions for the Harvest Homes from members of Harvest Riverside in California, and then arranging their transport to Romania as an agent of Harvest Riverside and ARK. On their behalf, he visited the Harvest Homes three times. No later than 1999, Roman told Cojocnean that he feared Havsgaard was a pedophile.

250.    Cojocnean told Roman that when Havsgaard went back to California for his fundraising trips, he badmouthed Roman as dishonest, apparently seeking to "prebut" any possible criticisms of his own behavior.

251.    Havsgaard apparently suspected that Roman had told Cojocnean about his pedophilia, so Havsgaard then badmouthed Cojocnean to people at Harvest too.

252.    On information and belief, Cojocnean told his supervisors at Harvest about his suspicions of Havsgaard's pedophilia. Cojocnean eventually became disgusted that Harvest Riverside was leaving Havsgaard in place and taking advantage of the people whose donations he was canvassing for Romania, so he left the church.

253.    Roman felt intimidated by Havsgaard but continued to collect evidence about his illicit behavior.

254.    In 2003, Roman went to the Buftea home and asked the staff if Havsgaard was doing anything unusual at night. The night staff told him that Havsgaard was often out with a boy named Julian J.

255.    Roman learned that Havsgaard had ordered the night watchman, Crivceac, not to log his nocturnal travels with boys. Crivceac said to Roman it seemed evident Havsgaard was having sex with Julian J.

256.    Roman found receipts that corroborated Havsgaard's late-night trips with Julian J. and other boys, showing repeated purchases of snacks for two people

after midnight at gas stations on the Bucharest ring road including purchases of alcohol.

257.   Armed with this new evidence, Roman confronted Havsgaard, who claimed he was taking Julian J. out "to evangelize him." Roman did not believe this.

258.   Roman then discovered that Havsgaard was paying his driver, Marcel Musceleanu, $600 per month, compared to the $400 per month Roman was earning as Finance Director—a huge salary for a driver, much more than the Local Foundation needed to pay at standard rates.

259.   This suggested to Roman that Havsgaard was using Harvest money to buy silence from his driver about where he was taking him, who was with him, and what he was doing.

260.   Roman also learned that Havsgaard was paying Manescu, another driver who also ran an internet café Havsgaard liked to go to, directly in cash and without receipts, which also signaled Havsgaard was trying to hide something.

261.   Finally, Julian J. disclosed to Roman that Havsgaard had committed sexual acts with another child. Mama Tina, the cook, also told Roman that Peter P. had come into the kitchen very upset and asked Mama Tina if she knew what Havsgaard "did to the children."

262.   Roman spoke to Mugur Dragomir, a lawyer friend and former police colonel, who said the evidence was sufficient to destroy Havsgaard and Harvest's reputation.

263.   While stopping Havsgaard was important to Roman, Roman did not want to destroy the Harvest Homes and force the children back into the streets.

264.   By October 2004, Roman thought he had enough evidence confirming Havsgaard's pedophilia and confronted him again. Roman gave Havsgaard 30 days to have Laurie choose and announce Havsgaard's replacement.

2.    *Harvest Riverside Investigates Havsgaard in 2004*

265.    Havsgaard did contact Laurie and Schutte about Roman's ultimatum, but, on information and belief, he falsely accused Roman of stealing money and of trying to obscure that theft by accusing Havsgaard of child abuse.

266.    At about this same time, Steve Quarles, a Calvary minister working in Romania, heard reports that Havsgaard was abusing the children in the homes. He left a phone message at Harvest Riverside laying this out in a way he expected would generate a rapid response. No one called him back.

267.    Disturbed by the strange silence, he asked the pastor from his home church in California, John Dunkan of Calvary Chapel Lake Elsinore, to call on his behalf and implore Harvest Riverside to investigate.

268.    Some weeks later, Quarles was home in California and happened to be in the Lake Elsinore church office when he took a phone call in the absence of Pastor Dunkan. A person he believes to be Schutte said, "We have a problem. One of your missionary pastors has made an awful accusation about Paul Havsgaard." Schutte was angry. Quarles told Schutte that in fact he was the source of the accusation, and a tense conversation ensued.

269.    Several days later, as he was being driven to the airport to go back to Romania, Quarles received another call from Schutte, who was much more amiable. Schutte asked Quarles if he would replace Havsgaard and run the Harvest Homes. Quarles did not want the job but agreed to perform an audit of the Harvest Homes. Anticipating that Havsgaard would be fighting for his professional life, Quarles said he would run the audit only if he could have the help of two other Calvary pastors working in Romania, Shane Herman ("Herman") and Bob Keenan ("Keenan"). Schutte agreed.

270.    The three performed the audit in October 2004.

271.    Quarles, Herman and Keenan interviewed staff at all the houses being run by Havsgaard and discovered turmoil.

1    272.    Crivceac, the night caretaker, provided a statement to the audit team,

2    stating that his wife, a cleaner at the homes, had told him that things there were "not

3    right," so he had kept his eyes open and began seeing suspicious behavior by

4    Havsgaard.

5    273.    Crivceac reported that Havsgaard was "overly touchy" with the kids,

6    looking to cuddle them much too often. He gave some boys large amounts of

7    attention and would go out at night with a single boy at a time, not returning until

8    well past midnight.

9    274.    Crivceac also reported that Havsgaard took one particular favorite, Leo

10   L., on trips and gave him many gifts. When Crivceac asked Leo L. where Havsgaard

11   took him, Leo L. refused to answer.

12   275.    Havsgaard would also regularly take individual boys into the attic for

13   extended periods.

14   276.    Three boys—Alexandru M., Peter P. and Mark M.—had told Crivceac

15   that Havsgaard had sexually abused them, and Peter P. often loudly and publicly

16   proclaimed this.

17   277.    Quarles was so alarmed by what he learned from Crivceac and others

18   that he insisted to Schutte that he come see the Harvest Homes for himself.

19   278.    In November 2004, Schutte, accompanied by Denham, another senior

20   Calvary pastor on the board of ARK, arrived in Bucharest to see the Harvest Homes

21   on behalf of Harvest Riverside and Laurie. They met with the audit team of Quarles,

22   Herman and Keenan, who told the visiting chiefs from headquarters the following

23   findings from their survey of the homes:

24            a.    Ample money was arriving from Harvest Riverside, some

25                  $17,000 a month, but Havsgaard was spending some $5,000 of it

26                  without receipts or other records. Because dollars went a long

27                  way in Romania at that time, these were substantial sums,

28                  particularly as the siphoning accumulated over the years.

b.    They had seen receipts gathered by Roman which showed Havsgaard taking boys to hotels hours away from Bucharest, and going on trips with them in Bucharest where they would buy snacks and alcohol after midnight.

c.    Roman had told the audit team that he had heard multiple accounts of sexual abuse by Havsgaard from both staff and children in the homes.

d.    Roman had told them that he also understood that Havsgaard had been arrested for child abuse in Romania.

279.    Schutte and Denham then met with Roman directly. Their line of questioning surprised Roman, who was worried about Havsgaard's sexual abuse, because the visitors avoided that topic to focus on Havsgaard's misuse of Harvest Riverside money.

280.    Roman answered their questions, telling them how suppliers were not being paid because Havsgaard was not providing him with enough funds despite the regular payments from Harvest Riverside, and produced detailed accountings over many months. Schutte was shocked and asked for a copy, which Roman provided. Schutte then promised that Harvest Riverside would pay the shortfall and send it directly to the Local Foundation's account, bypassing Havsgaard to whom Harvest Riverside had previously sent all California funds directly.

281.    Roman also raised his worries about Havsgaard as a pedophile. He gave the visitors an account of Havsgaard's inappropriate spending on late-night excursions with the boys, and relayed reports from other staff about Havsgaard's abuse.

282.    At the end of the meeting, Schutte took him aside and directed him to stop talking about any child abuse by Havsgaard. Schutte then returned to California.

283.   Even so, Quarles was now persuaded that Havsgaard was a pedophile. He was based in Romania and called Roman to say he was thinking of reporting Havsgaard to the police.

284.   Roman worried that the homes might collapse and told Quarles that replacing Havsgaard would be better than abruptly getting him sent to jail and leaving the Harvest Homes leaderless.

285.   Quarles pursued the idea of replacing Havsgaard quickly with his contacts at Harvest Riverside in California.

286.   Several weeks later, Schutte returned to Romania.

287.   Quarles believed the overwhelming evidence that Havsgaard was a pedophile and thought firing him from Harvest was essential. He told Schutte and Denham, "Paul [Havsgaard] needs to be on that plane with you when you leave tomorrow. He doesn't need to be another day in Romania. He is an embarrassment to every single missionary and Christian worker. Get him out of here and into counselling."

288.   That started out as the plan. Schutte, Pastor Shane Herman and a Romanian businessman, Robert Dinca, met with Roman and told him that Havsgaard would be on a plane to California in the next few days, but Roman also had to resign.

289.   Apparently, Defendants wanted a "clean sweep" of the old regime and no one in power left to reveal their failings to authorities in Romania or California. Quarles and Herman were going to take over for Havsgaard, and Dinca was going to take over for Roman.

290.   But Havsgaard refused to leave, and Defendants acquiesced. When the time came for Havsgaard to go, Schutte and Denham told Quarles that Havsgaard "is very important because he is the face of the ministry. He's the one who goes and talks to the churches and raises the money. We can't not have him be part of things."

291.   This answer had to reflect the views of Laurie, the ultimate authority at Harvest Riverside who had set the entire Romanian enterprise in motion and had

taken credit for it. This was an acutely sensitive matter, Havsgaard was Laurie's long-time collaborator, and the idea that Schutte decided this independently of Laurie is not credible.

292.    This reply was so shocking that Quarles told Harvest leaders he "wanted to have nothing to do with them after this."

293.    The result was that Havsgaard was not replaced. Schutte and Denham went back to California leaving Havsgaard in command in Romania, the same as before—except with added powers. Instead of appointing Dinca as Finance Director as Schutte had arranged, Laurie and Schutte let Havsgaard appoint Manescu, his driver who ran the internet café where he often took boys for sex-cam work, at a highly inflated salary. Manescu had no background for the position and had good reason to go on protecting Havsgaard.

## V.    HARVEST RIVERSIDE AND LAURIE COVER UP HAVSGAARD'S CHILD SEX ABUSE

294.    Schutte and/or Denham reported the disturbing results of their inquiry mission to Laurie at Harvest Riverside when they returned to California.

295.    The scale of Havsgaard's crimes and his rank incompetence in running the Harvest Homes should have been anticipated by Laurie and were easily discoverable by all Defendants from the start of Havsgaard's time in Bucharest. Nevertheless, the clear notice of Havsgaard's pedophilia, theft, and chaotic management that Schutte brought back with him from Bucharest in 2004 gave Harvest Riverside, and Laurie, an obligation to take immediate corrective action.

296.    Instead, they did nothing.

297.    Defendants did not recall Havsgaard for questioning.

298.    Defendants did not put Havsgaard on leave.

299.    Defendants did not discipline Havsgaard.

300.    Defendants did not require Havsgaard to attend counselling.

301.    Defendants did not induce Havsgaard to retire.

302.    Defendants did not fire Havsgaard.

303.    Defendants did not shut down the Harvest homes.

304.    Defendants did not send competent administrators to replace or supervise Havsgaard.

305.    Defendants did not introduce any guard rails to prevent Havsgaard from further abusing children in Romania.

306.    Defendants did not institute mechanisms for children or staff at Harvest Homes to report future abuse by Havsgaard.

307.    Defendants did not arrange for medical or psychological help for the affected boys and girls.

308.    Defendants did not order any more inspection trips or other inquiries, nor did Laurie or Schutte visit themselves.

309.    Defendants did not immediately report Havsgaard to the police or child protection authorities in Romania or the United States, although Schutte, Denham, and Laurie were at all material times "mandatory reporters" of child sex abuse under California law, and this obligation extended to abuse committed outside of California, especially by one of their employees.

310.    Instead of taking any of the meaningful actions listed above, Laurie made the strategic decision to cover up the scandal. He turned a blind eye, and thus so did everyone else at Harvest Riverside.

311.    Defendants protected their money by cutting back on the amounts they sent to Havsgaard to run the Harvest Homes but otherwise acted as if everything was fine.

312.    Defendants had a legal and moral obligation from the day they opened the Harvest Homes in Romania in 1998 to assure they were run safely.

313.    Instead, Defendants ignored repeated evidence of Havsgaard's abuse of children in California before he left for Romania, and again from his arrival in Bucharest in 1998.

314.    The abuse the children endured after 2004, when Laurie, Schutte and Harvest Riverside clearly knew all about it but simply ignored their legal and moral obligation to intervene, is especially reprehensible.

A.    **After the Cover-Up, Harvest Homes Get Poorer while Child Sexual Abuse Remains Rampant**

315.    Once he weathered Defendants' consequence-free investigation, Havsgaard retaliated against Roman for blowing the whistle and fired him.

316.    Despite Havsgaard's pedophilia and long misuse of Harvest funds, he was given authority over Harvest's Romanian accounts at the bank, appointing his poorly educated driver Manescu to be Finance Director, at a highly inflated salary he knew depended on Havsgaard's continued good standing with Harvest Riverside.

317.    Manescu sometimes refused to pay the staff, likely pocketing their wages.

318.    As Finance Director, Manescu required that some of the children work 12-hour shifts in his internet café at less than minimum wage. When they protested, he threatened to throw them out of the Harvest Homes. When the children complained to Havsgaard, he did nothing to protect them.

319.    Manescu derided Mariana Constantin ("Constantin"), the regular social worker, for caring for the children and told her not to bother, since they all came from the streets and were "just garbage" anyway.

320.    Manescu knew about Havsgaard's sexual abuse of children. Knowing that Havsgaard got away with it, Manescu felt emboldened to abuse children himself. Manescu primarily preyed on minor girls, either by groping their breasts, touching them in a lingering way, and pressuring them to have sex with him. He would force girls out of the homes and into a van, where he then sexually assaulted them. Mimicking Havsgaard, Manescu thereafter gave his victims extra privileges and/or gifts.

**B.    Once Defendants finally Close Harvest Homes, its Children Have Nowhere to Go; Many Turn to Sex Work**

321.    Under the joint leadership of Havsgaard and Manescu, with much of the shrinking money still coming from California being diverted to their personal use, the homes became even more dangerous. Food and heat were sporadic, and the danger of more abuse by Havsgaard was constant.

1.    *Havsgaard's Supervisors Leave Him Unchastened*

322.    Constantin, a social worker, inspected the Harvest Homes for the Romanian government between 2004 and 2005, among many other facilities on her roster. Her assignment was to check only for sufficient food and living conditions and she did not have time to interview any children. In 2005, Harvest advertised a job for a resident teacher in the Buftea home, which she thought would be more interesting and a shorter commute, and got the job. Constantin was surprised because Havsgaard hired evangelical Christians only, and Constantin is Orthodox. She concluded that he thought her presence would reassure the next social worker who would not feel a need to look deeply into his operation.

323.    Constantin says she "realized that something strange was definitely happening to the boys." She asked Mama Tina, the cook, who said "don't ask, bad things are happening" and started crying. Mama Tina told her that she had lots of children at home, so she had to keep her mouth shut or lose her job.

324.    Constantin saw that Havsgaard had favorites and regularly took them away for one-on-one expeditions, after which the boys would come back subdued and not disclose where they had gone or what they had done. When she remonstrated with him and said the boys should be in school, he would say the boy in question needed some extra attention because he had had a bad day.

325.    After she developed a good relationship with the boys, they told her that Havsgaard had ordered them not to talk about what they were doing, and that they were scared of being kicked out if they did.

326.    Some boys ultimately confessed to her that Havsgaard was abusing them but told her not to tell anyone so they did not end up back on the street. She told them that together they could figure out a better path, but they were too scared.

327.    Unable to get any direct confessions, Constantin looked for physical evidence like photos when she moved around the house but never found any. She came to feel impotent and guilty, and ultimately quit, convinced that Havsgaard was an active pedophile at the Harvest Homes.

328.    Monique Smith, an American visitor who spent several months a year in the homes starting in 2002, noticed that as early as 2005, conditions had deteriorated significantly, particularly at the girls' home in Dămăroaia.

329.    The children did not have regular meals and were often fed bread sandwiches and cabbage.

330.    There was no running hot water in the bathroom for at least a month, and the staff boiled water to mix with cold water to bathe.

331.    As the money ran out, Harvest Riverside and Laurie made no provision for the children's further housing, safety, welfare or education.

332.    When the Harvest Homes finally closed, Defendants dumped the children on the street and gave them no exit money, no plan, not even a number to call in an emergency.

333.    Few had any education that would help them survive safely, let alone prosper; some were not even literate.

334.    Many roamed the streets hungry, homeless, in despair and fear, and were routinely assaulted. Laurie and Harvest abandoned them.

335.    Having learned from Havsgaard that the route to survival was to sell their bodies to him and others, many turned to sex work.

VI.    **AFTER HARVEST HOMES CLOSE, PLAINTIFF STRUGGLES WHILE DEFENDANTS THRIVE**

A.    **Plaintiff's Present Circumstances**

*Figure 11: Mihai-Constantin Petcu, 2023*



336.    With only six years of schooling, no qualifications, and a minimal understanding of English, Mihai's best way to make money after he left the Harvest Homes was to continue doing sex work to obtain drugs and food.

337.    Mihai currently works as a security guard.

338.    He continues to exhibit symptoms from his time at Harvest. He used to sniff paint. He struggles with depression and has attempted suicide.

339.    Mihai suffers from severe, complex Post-Traumatic Stress Disorder, anxiety disorders, substance abuse disorders, and Major Depressive Disorder.

340.    While Mihai has not yet been able to travel to a country where he could be examined by a neuroscience professional, his behaviors and apparent cognitive

1  difficulties indicate he has suffered frontal lobe damage due to his exposure to severe

2  violence, trauma and sexual abuse.

3      341.  Also because of Defendants' scheme to abuse the Romanian children,

4  Mihai has remained in abject poverty his entire adult life. He has not been able to

5  maintain employment or sobriety and has been intermittently homeless throughout

6  his adulthood.

7      **B.    Havsgaard has Continued His Ministry, Protected and Even**

8          **Praised by Laurie**

9      342.  The cover-up strategy chosen by Laurie and Harvest Riverside involved

10  turning down their fundraising featuring Romanian homeless children slowly so

11  people in California would not see any abrupt change of direction and would

12  continue to donate, while also slowly shutting off the money spigot to Bucharest,

13  causing the Harvest Homes to slowly wither and finally die for lack of funds.

14      343.  That process of quiet extrication, delicately orchestrated by Defendants,

15  took four more years, until 2008, during which Havsgaard remained in charge and

16  licensed by Laurie to sexually abuse scores of children thousands of more times.

17      344.  Laurie gave Havsgaard a substantial gift in a series of severance

18  payments totaling approximately $200,000.

19      345.  When the homes did close, Havsgaard returned to the United States

20  with an unblemished record and no restrictions, a noble missionary coming home.

21      346.  In 2009—a year after the closure of the Harvest Homes and five years

22  after the Schutte mission had found evidence of Havsgaard's theft and industrial-

23  grade pedophilia—Laurie praised Havsgaard publicly. Laurie described Havsgaard

24  as "a pastor who faithfully served the Lord for many years at Harvest Christian

25  Fellowship, the church where I pastor," and compared his work in Romania to that

26

27

28

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

of Moses with the Israelites, because his "life demonstrates the power that just one godly person can have."[6]

347.    Havsgaard was permitted to take up duties in the Calvary Chapel network.

348.    Laurie, Schutte and Harvest Riverside did not warn any of these churches about Havsgaard's compulsive pedophilia and violence.

349.    Throughout his post-Bucharest pastoral work in California, Havsgaard has continued to have unsupervised access to children.

*Figure 12: Ad in a Packinghouse Facebook post showing Havsgaard as a respected religious figure in circles close to Harvest Riverside, August 17, 2023*



350.    In 2012, Havsgaard became Pastor at Calvary the Cross in Riverside, a 15-minute drive from Laurie's office at Harvest Christian Fellowship.

---

[6] Laurie, *supra*.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

351.   Havsgaard has periodically visited Tijuana, Mexico with Robert Probert, like him one of the original incorporators of Calvary Chapel Riverside, the precursor to Harvest Riverside. Their declared mission is to minister to poor people. Tijuana, like Bucharest, has one of the highest rates of child trafficking and child prostitution in the world.

352.   On September 2, 2023, Havsgaard led a senior adults' Bible study at the Packinghouse Christian Fellowship, run by Probert.

353.   As recently as August 5, 2025, Havsgaard advertised himself on LinkedIn as "Open to Work" as a bereavement counselor.

354.   Havsgaard now leads a quiet life in retirement close to Riverside, spending hours a day online. Topics in which Havsgaard has expressed public online interest in the past two years include: "Feeling awkward after his last Google search on his phone and how to delete it," "Removing his personal information from Google searches," "How to screen record someone with an Android phone," "Banks watching him move large sums of money in his bank account," "How to quickly remove your browsing history with a short keystroke," "Wiping data from phones and computers before selling them," "Deleting his Google drive cache," and "Converting VHS tapes to digital." The collection of pornography Havsgaard showed to children in Bucharest was on VHS, as were the tapes used in the cameras set up in the attic rooms where he had sex with children.

355.   Other topics he searched include "The deep cost of his sin" and "Can we forgive when an offender won't repent?"

356.   In 2014, Havsgaard married Susan Marlowe. Between them they have at least ten grandchildren. They moved to Forest Falls, California, where Havsgaard's office is located in a remote section of the house alongside the guest bedroom where the grandchildren stay. Laurie did not warn Marlowe about Havsgaard's history of prolific bullying and sexual abuse.

1    **C.    Harvest Riverside Flourishes**

2    357.   In the years since the cover-up, Harvest Riverside has flourished. Its

3 estimated annual revenues are at least $52 million, generating at least $13 million in

4 free cash flow. Harvest Riverside and Laurie together own and lease properties

5 conservatively valued at over $100 million, including a 30-acre campus in Riverside,

6 and luxury homes in California and Hawaii. Laurie has written over 70 books, has a

7 television show and highly successful podcast. Laurie's national prominence only

8 continues to increase.

9 **VII.  CONCLUSION**

10    358.   Plaintiff and many others came to the Harvest Homes as discarded,

11 deprived children seeking dignity and stability. They were promised care and

12 compassion, but were sexually, physically and emotionally abused over many years,

13 then dumped back out onto the streets. Nearly 20 years later, it is time for their

14 suffering to end.

15    359.   Children spent an average of 6.5 years in the Harvest Homes.

16 Havsgaard was able to keep them there so long because, as he cynically calculated,

17 they were desperate to get off the streets, and no one would care enough about street

18 urchins like them to do anything to help them.

19    360.   Worst of all, Havsgaard's cynicism was precisely right. Certainly his

20 prediction that no one would do much to stop him accurately describes the other

21 Defendants.

22    361.   Laurie sent Havsgaard to Romania, chose him to run Harvest

23 Riverside's mission there, and thereafter acted as if he and Harvest Riverside had

24 nothing to do with the Harvest Homes they set up—no regular inspections, no

25 policies, no staff training, no safeguarding protocols, no following up when

26 disturbing stories got back to California—no effective supervision as Havsgaard

27 energetically abused scores of children. Yet they happily reaped praise and donations

28 as they refused to see the grim reality of their Romanian outpost.

362.   When Laurie finally had to send an inspection team in 2004 headed by Schutte to dig into the details after receiving dreadful reports that could not be ignored, Schutte came back with conclusive proof that Havsgaard was an active pedophile presiding over bedlam.

363.   Even then, Laurie did nothing to help the children. Instead he let Havsgaard remain in control for another four years of inflicting sexual abuse on the powerless, and then welcomed him back to a life of comfort and esteem in California with a generous gift of severance payments and public praise.

364.   In 2018, after reports of sexual misconduct by other senior Calvary ministers became widely reported, Laurie said:

> It is a great disappointment to me when a pastor fails. A pastor needs to be a good example. He is a spiritual leader. People expect pastors to live morally and to be honest. That is a realistic expectation. They expect it of Christians, certainly they have that expectation of a Christian leader.

365.   One might expect Laurie's commendable determination to live morally and honestly to be reflected in his stance toward the terrible results of Defendants' misadventures in Romania, but so far that has not been evident.

366.   Havsgaard is an unrepentant lawbreaker, but he has ample company in the ugly saga of the Harvest Homes. Laurie, Schutte and Harvest Christian Fellowship also continue to deny and cover up the suffering they have caused Plaintiff and his colleagues for the last two decades. They knowingly created the conditions that posed a substantial risk of child sexual abuse, let it run unchecked for years, and then, once the dreadful consequences could no longer be ignored, conspired to cover up those crimes.

367.   Defendants are properly subject to the power of the State of California and United States to punish this long record of misconduct, and to the power of the public to abhor it. Plaintiff thus turns to this Court for redress.

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

1

2

## **CLAIMS FOR RELIEF**

3

## **FIRST CAUSE OF ACTION**

4

### **NEGLIGENCE**

5

#### ***Against Harvest Riverside, Laurie and Schutte***

6

*GENERAL NEGLIGENCE*

7    368.    Plaintiff restates the allegations set forth in the preceding paragraphs.

8    369.    The conduct and actions of Harvest Riverside, Laurie and Schutte

9  created an environment in which Havsgaard for decades abused minor children,

10  including Plaintiff, who was a minor at the time of Havsgaard's sexual assaults.

11    370.    Harvest Riverside, Laurie, and Schutte were in a special relationship

12  with Plaintiff. Harvest Riverside, Laurie and Schutte created, funded, and controlled,

13  set policy, and were responsible for all aspects of managing the Harvest Homes.

14  Harvest Riverside voluntarily took Plaintiff into the Harvest Homes and agreed to

15  care for and provide for Plaintiff who was a child under the age of 18.

16    371.    At all material times, Plaintiff was a resident of Harvest Homes in the

17  custody and care of Defendants.

18    372.    Prior to the last time Plaintiff was sexually abused by Havsgaard,

19  Harvest Riverside, Laurie and Schutte were aware and/or on notice of Havsgaard's

20  sexual misconduct with minors. By performing the acts alleged herein, it was or

21  should have been reasonably foreseeable to Harvest Riverside, Laurie and Schutte

22  that by continuously exposing and making Plaintiff available to Havsgaard, they

23  created a risk of harm to Plaintiff and made Plaintiff's position worse.

24    373.    Harvest Riverside, Laurie and Schutte allowed and empowered

25  Havsgaard to represent himself as their employee and/or agent when he recruited

26  Plaintiff and other children, which gave Plaintiff an expectation and right to be

27  protected by Harvest Riverside, Laurie and Schutte.

28

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

374.    Harvest Riverside, Laurie and Schutte assumed responsibility for the safety of Plaintiff whose parents were not present while Plaintiff was a resident of Harvest Homes.

375.    At all material times, Harvest Riverside, Laurie and Schutte were able to control Havsgaard's conduct related to his custody and care of Plaintiff and other child residents of the Harvest Homes.

376.    At all material times, Harvest Riverside, Laurie and Schutte owed Plaintiff a duty of reasonable care to protect him from foreseeable injury and abuse while Plaintiff resided within the Harvest Homes in Havsgaard's custody and care, and while Plaintiff relied upon the assurance of Harvest Riverside, Laurie and Schutte of safety and protection.

377.    Harvest Riverside, Laurie and Schutte breached their duties by failing to take any reasonable steps or implement any reasonable safeguards for Plaintiff's protection.

378.    Harvest Riverside, Laurie and Schutte breached their duties to Plaintiff by putting Havsgaard, a man with an extensive history of child sexual abuse they knew or should have known of, in charge of children's homes; locating those homes in a country known to attract pedophiles and have weak and corrupt governmental institutions; not regularly inspecting the homes; not regularly checking with staff at the homes about conditions there; not instituting regular training for staff about recognizing and reporting child abuse; not having any safeguarding policies or guardrails in place; instituting lax financial controls such that Havsgaard was easily able to divert funds into purchases for his sexual favorites and hush money for employees; ignoring reports from credible sources that Havsgaard was an active pedophile taking advantage of children at the homes; after receiving further and conclusive proof of Havsgaard's pedophilia in 2004, leaving him in charge without any reduction in his powers or changes in the way the homes were run or supervised; not reporting Havsgaard to the authorities in California or Romania; continuing to

- 63 -

1  praise Havsgaard in public despite knowing him to be a pedophile; not trying to
2  identify Havsgaard's victims or help them recover.

3  379.  At all material times, Laurie and Schutte personally participated in,
4  authorized, directed the wrongful action and inaction by Harvest Riverside and its
5  authorized agents in breach of Defendants' duty of reasonable care.

6  380.  At all material times, Harvest Riverside, Laurie and Schutte were guilty
7  of oppression, fraud, and/or malice insomuch as they, individually or collectively,
8  acted with intent or willful and conscious disregard for the rights or safety of
9  Plaintiff, subjecting Plaintiff to cruel and unjust hardship under the circumstances.

10 381.  As a direct, foreseeable and proximate cause of Harvest Riverside's,
11 Laurie's and Schutte's breach of their respective duties of reasonable care, Plaintiff
12 suffered compensable injuries, including physical and emotional injuries as set forth
13 herein.

14 *NEGLIGENCE PER SE*

15 382.  Plaintiff restates the allegations set forth in the preceding paragraphs.

16 383.  In or around 1999 and continuing thereafter, while Plaintiff was a
17 resident in the care of Havsgaard in the Harvest Homes, Harvest Riverside, Laurie
18 and Schutte and their employees and agents received complaints in their professional
19 capacity and within the scope of their employment that minimally raised a
20 reasonable suspicion that Havsgaard was engaging in sexually inappropriate and
21 abusive conduct with Plaintiff.

22 384.  At all material times, Plaintiff was a minor under the age of 18 years
23 old.

24 385.  At all material times, Harvest Riverside, Laurie and Schutte and their
25 employees and agents were mandated reporters within the meaning of Cal. Pen.
26 Code § 11165.7.

27 386.  By statute, each of Laurie and Schutte and the employees and agents of
28 Harvest Riverside had a duty to present to appropriate authorities the reports of

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*

suspected child abuse, neglect, and sexual abuse Plaintiff suffered while in the care of the Harvest Homes.

387.   At no material time did Laurie, Schutte or the agents or employees of Harvest Riverside report their reasonable suspicions of Havsgaard's sexual abuse of Plaintiff to appropriate authorities.

388.   The failure to report Havsgaard's sexual abuse as required by statute constitutes negligence per se.

389.   At all material times, Defendants were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiff, subjecting Plaintiff to cruel and unjust hardship under the circumstances.

390.   As a direct and proximate cause of the failure to report Havsgaard's sexual abuse of the Plaintiff, Plaintiff continued to suffer sexual, physical, and emotional abuse by Havsgaard while Plaintiff remained in the care of the Harvest Homes, resulting in the injuries and damages individually set forth herein.

*NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS*

391.   Plaintiff restates the allegations set forth in the preceding paragraphs.

392.   Harvest Riverside, Laurie and Schutte negligently failed to deal with Plaintiff in good faith including, but not limited to, by engaging in outrageous conduct by unreasonably, maliciously, oppressively failing to remove Havsgaard from his position and from access to children even after discovering that he was sexually abusing Plaintiff and other children.

393.   As a result of the actions and inaction of Harvest Riverside, Laurie and Schutte, Plaintiff suffered severe emotional distress of such substantial and enduring quality that no reasonable person in a civilized society can be expected to endure it.

394.   Plaintiff has suffered from serious emotional distress including but not limited to nightmares, depression, PTSD, and suicidal thoughts.

395.   The negligent failure by Harvest Riverside, Laurie and Schutte to deal with Plaintiff in good faith was a substantial factor in causing Plaintiff's severe emotional distress.

396.   As a result, Plaintiff has suffered damages as set forth in this complaint.

## SECOND CAUSE OF ACTION

### NEGLIGENT SUPERVISION

*Against Harvest Riverside, Laurie and Schutte*

397.   Plaintiff restates the allegations in the preceding paragraphs.

398.   At all material times, Havsgaard was an employee and/or agent of Harvest Riverside.

399.   At all material times, Harvest Riverside, Laurie and Schutte owed Plaintiff a legal duty to reasonably and adequately supervise the employees and agents selected and entrusted to run the Harvest Homes in Romania.

400.   By their action and inaction, Harvest Riverside, Laurie and Schutte breached their duties of reasonable and adequate supervision when they failed, despite known and foreseeable risks of sexual abuse in the Harvest Homes, to regularly inspect the homes; to regularly check with staff at the homes about conditions there; to institute safeguarding policies or mechanisms; to educate, train, or warn potential victims of Havsgaard and their parents; to institute proper financial controls to keep Havsgaard from readily diverting funds into purchases for his sexual favorites and hush money for employees and others who might report his illegal acts; to act on reports from credible sources that Havsgaard was an active pedophile taking advantage of children at the homes after receiving conclusive proof of his pedophilia and theft, to recall Havsgaard or change the way the homes were run and inspected; and to timely report him to authorities in California or Romania.

401.   At all material times, Laurie and Schutte personally participated in, authorized, or directed the wrongful action and inaction by Harvest Christian

Fellowship and its authorized agents in breach of Harvest Riverside's, Laurie's and Schutte's duty of reasonable and adequate supervision.

402.   At all material times, Harvest Riverside, Laurie and Schutte were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiff, subjecting Plaintiff to cruel and unjust hardship under the circumstances.

403.   The failure of Harvest Riverside, Laurie and Schutte to reasonably and adequately supervise Havsgaard and other employees and agents in Harvest Homes was a direct, proximate, and substantial factor in causing Plaintiff to suffer compensable injuries, including physical and emotional injuries as set forth herein.

## THIRD CAUSE OF ACTION

## NEGLIGENT RETENTION

### *Against Harvest Riverside, Laurie and Schutte*

404.   Plaintiff restates the allegations in the preceding paragraphs.

405.   At all material times, Havsgaard was an employee and/or agent of Harvest Riverside.

406.   At all material times, Laurie and Schutte had the authority to control the terms and conditions of Havsgaard's employment with Harvest Riverside, including the authority to terminate his employment.

407.   During his employment with Harvest Riverside, Havsgaard was or became unfit or incompetent to perform the work for which he was hired.

408.   During his employment with Harvest Riverside, Havsgaard's unfitness and/or incompetence created a particular risk to others, including Plaintiff.

409.   Harvest Riverside, Laurie and Schutte knew or should have known Havsgaard was or became unfit and/or incompetent to perform the work for which he was hired because of the particularized risk to others.

410.   Despite actual or constructive knowledge of Havsgaard's unfitness to perform the work for which he was hired, Harvest Riverside, Laurie and Schutte

failed to take appropriate remedial action to terminate Havsgaard or otherwise alter the terms and conditions of his employment to address Havsgaard's particularized risk of harm to Plaintiff.

411.    Havsgaard's unfitness and/or incompetence harmed Plaintiff.

412.    The negligence of Harvest Riverside, Laurie and Schutte in retaining Havsgaard despite actual and constructive notice of Havsgaard's unfitness and/or incompetence was a direct, proximate, and substantial factor in causing Plaintiff's harm.

413.    At all material times, Laurie and Schutte personally participated in, authorized, or directed the wrongful action and inaction by Harvest Riverside and its authorized agents in breach of the duty of Harvest Riverside, Laurie and Schutte not to retain an unfit person.

414.    At all material times, Harvest Riverside, Laurie and Schutte were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiff, subjecting Plaintiff to cruel and unjust hardship under the circumstances.

415.    The failure of Harvest Riverside, Laurie and Schutte to reasonably and adequately supervise Havsgaard and other employees and agents in the Harvest Homes was a direct, proximate, and substantial factor in causing Plaintiff to suffer compensable injuries, including physical and emotional injuries as set forth herein.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *Against Harvest Riverside, Laurie, and Schutte*

416.    Plaintiff restates the allegations in the preceding paragraphs.

417.    By their actions and inaction, Defendants engaged in outrageous conduct that is so extreme as to exceed all bounds of decency in a civilized society.

418.    By their actions and inaction, Defendants acted knowingly and willingly with the intent or with reckless disregard of the probability of causing

emotional distress despite actual and constructive knowledge of Plaintiff's peculiar susceptibility to emotional distress due to his young age, unstable living conditions, and previous sexual and emotional abuse by Havsgaard.

419.   As a result of the actions and inaction of Defendants, individually or collectively, Plaintiff suffered severe emotional distress of such substantial and enduring quality that no reasonable person in a civilized society can be expected to endure it.

420.   The actions and inaction of Defendants were the direct and proximate cause of Plaintiff's severe emotional distress.

421.   At all material times, Laurie personally participated in, authorized, or directed the wrongful and outrageous action and inaction by Harvest Riverside and its authorized agents which resulted in Plaintiff's damages.

422.   At all material times, Defendants were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of the Plaintiff, subjecting him to cruel and unjust hardship under the circumstances.

423.   As a result, Plaintiff has suffered damages as set forth in this complaint.

## FIFTH CAUSE OF ACTION

### CIVIL CONSPIRACY IN VIOLATION OF CALIFORNIA LAW

#### *Against Harvest Riverside, Havsgaard, Laurie and Schutte*

424.   Plaintiff restates the allegations in the preceding paragraphs.

425.   Defendants conspired with others both known and unknown, and continue to conspire, to commit intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking offenses, and to cover up those offenses and the conspiracy.

426.   Defendants formed a group of two or more persons who conspired and agreed to a common plan or design to commit tortious acts, including intentional

- 69 -

infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking.

427.   Defendants formed the conspiracy on an unknown date no later than 1999, when Cojocnean, working as agent of Harvest Riverside, learned from Roman, the Harvest Homes and Local Foundation Finance Director, that Roman had evidence of Havsgaard's pedophilia, and reported this to officials at Harvest Riverside.

428.   Defendants had actual knowledge that tortious acts including intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking were planned by the co-conspirators and concurred and participated in the tortious scheme with knowledge of its unlawful purpose.

429.   Defendants intended to aid their co-conspirators in the commission of the planned tortious acts, including intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking.

430.   Defendants committed numerous wrongful acts, including intentional infliction of emotional distress, battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking against Plaintiff in the State of California pursuant to their agreement with their co-conspirators.

431.   Defendants committed overt acts in California in support of the conspiracy that included, among others, the following:

        a.    Continuously funding Havsgaard and the Romanian homes after receiving notice of Havsgaard's sexual battery of minors, including Plaintiff;

b.    Assisting in and facilitating fundraising for Havsgaard's activities in Romania;

c.    Failing to institute financial procedures or checks to curb Havsgaard's misuse of Harvest Riverside funds to serve his sexual predation of minors;

d.    Failing to institute routine inspections, safeguarding policies or guardrails at the Harvest Homes;

e.    Leaving Havsgaard in post after receiving notice of his sexual battery of minors, including Plaintiff; and

f.    Failing to report Havsgaard's sexual battery of minors to appropriate authorities.

432.    Even after concluding Havsgaard was a pedophile, Defendants paid Havsgaard $200,000 and kept quiet about his history of assaults, leaving him at the helm of the Harvest Homes to abuse existing residents and attract new ones for abuse.

433.    Defendants' affirmative conduct in furtherance of the conspiracy was undertaken with the express and/or implied agreement or understanding that Laurie and Schutte and others would facilitate and/or enable the intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking in order to enrich themselves and Harvest Riverside.

434.    Plaintiff was damaged as a direct result of Defendants' agreement and actions in furtherance of the conspiracy.

435.    Defendants' conduct has caused and continues to cause Plaintiff serious and permanent harm and damage.

**SIXTH CAUSE OF ACTION**

**AIDING AND ABETTING**

***Against Laurie and Schutte***

436.   Plaintiff restates the allegations in the preceding paragraphs.

437.   In committing the acts alleged herein, Laurie and Schutte had actual knowledge of the torts of sexual battery, intentional infliction of emotional distress, and sex trafficking being committed by Havsgaard.

438.   Through their action and inaction, Laurie and Schutte knowingly gave substantial assistance to Havsgaard's commission of sexual battery, intentional infliction of emotion distress and sex trafficking on Plaintiff.

439.   As an actual and proximate cause of the wrongful and malicious acts of Laurie and Schutte, Plaintiff suffered physical, emotional, and psychological harms in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ("TVPRA"), 18 U.S.C. §§1591(a) and 1595(a)**

***Against Havsgaard, Laurie, Schutte, and Harvest Riverside***

440.   Plaintiff restates the allegations in the preceding paragraphs.

441.   Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 1591(a)(1).

442.   Havsgaard knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff for the purpose of causing him to engage in commercial sex acts through force, fraud, or coercion in violation of 18 U.S.C. § 1591(a).

443.   Section 1591(a) applies extraterritorially to sex trafficking in Romania by virtue of 18 U.S.C. § 1596(a) because an alleged offender, Havsgaard, is a national of the United States.

444.   Defendants' conduct caused Plaintiff serious and permanent harm, including, without limitation, physical, psychological, financial, and reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm. As a victim of sex trafficking in violation of 18 U.S.C. § 1591(a), Plaintiff may bring a civil action against Havsgaard as a perpetrator and against Defendants as beneficiaries pursuant to 18 U.S.C. § 1595(a).

445.   Laurie, Schutte, and Harvest Riverside knowingly benefited by receiving something of value from participation in a venture that they knew or should have known was engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

446.   As a result, Plaintiff has suffered damages as set forth in this complaint.

## EIGHTH CAUSE OF ACTION

## ILLICIT SEXUAL CONDUCT IN FOREIGN PLACES IN VIOLATION OF 18 U.S.C. §§ 2423(c) and 2255

### *Against Havsgaard*

447.   Plaintiff restates the allegations in the preceding paragraph.

448.   In violation of 18 U.S.C § 2423(c), Havsgaard is a U.S. citizen who travelled to Romania and engaged in coerced sexual abuse of Plaintiff.

449.   Havsgaard engaged in a commercial sex act with Plaintiff.

450.   Plaintiff was a minor at the time of the events complained of herein.

451.   As a direct result of Havsgaard's violations as described herein, Plaintiff has suffered and will continue to suffer from the psychological and economic damages as described above.

452.   Plaintiff seeks remedies to which he is entitled under 18 U.S.C § 2255(a) including actual damages and the costs associated with this suit, including a reasonable attorney's fee.

1

## **DEMAND FOR JURY TRIAL**

2      453.   Plaintiff hereby demands a jury trial in this action.

3

## **PRAYER FOR RELIEF**

4      WHEREFORE, Plaintiff seeks a judgment against Defendants awarding the

5   following relief:

6      A.   Damages in amounts to be established at trial, including without

7         limitation, damages for past, present, and future emotional pain and

8         suffering, ongoing and severe mental anguish and physical injuries, loss

9         of past, present and future enjoyment of life, and past and future lost

10        earnings and earning capacity, and out-of-pocket expenses, punitive

11        damages and liquidated damages;

12     B.   Pre- and post-judgment interest;

13     C.   Attorney's fees;

14     D.   A fund administered by the Court to locate and compensate victims of

15        Defendants yet unknown; and

16     E.   Such other and further relief as the Court may deem just and proper.

17

18   Dated: September 16, 2025

19                              McALLISTER OLIVARIUS

20                              By: */s/ Jan Cervenka*

21                              Jan Cervenka

22                              *Attorneys for Plaintiff*

23

24

25

26

27

28

COMPLAINT | *Petcu v. Harvest Christian Fellowship, et al.*